**WEMBLEY, INC.**

v.

**DIPLOMAT TIE COMPANY.**

Civ. A. No. 12046.

United States District Court
D. Maryland.

March 11, 1963.

Melvin J. Sykes, Baltimore, Md., John H. O. Clarke, Annapolis, Md., Samuel Scrivener, Jr., Washington, D. C., Robert Weinstein, Martin L. C. Feldman, New Orleans, La., for plaintiff.

John Martin Jones, Jr., Piper & Marbury, Baltimore, Md., Albert J. Kramer, Washington, D. C., David Gerber, Burke, Gerber & Wilen, Baltimore, Md., for defendant.

R. DORSEY WATKINS, District Judge.

This is an action for alleged infringement by defendant of two registered trademarks owned by plaintiff, and for alleged unfair competition by the defendant. The complaint asserts that about June, 1954, plaintiff "conceived a special and novel plan and program for the merchandising of men's neckties, which plan and program was intended to increase the sale of neckties of its manufacture and which, in fact, had that result. This plan and program of merchandising included * * *" the adoption of the trademark "Color Guide" for plaintiff's neckties; the adoption of the trademark "The Tie with the Color Guide"; the registration of these two trademarks, the first on the Principal Register on August 14, 1956 by Registration No. 632,745 and the latter on the Supplemental Register on March 3, 1959 by Registration No. 675,108; the applying of a rider bearing one or both of the trademarks to plaintiff's ties; and the applying to each tie of a label advising the purchaser of the color of the suit with which the tie could best be worn; e. g. "wear with a black or blue suit;" and the advertising by plaintiff of this "merchandising plan and program and its neckties bearing the aforesaid rider and label * * *" Infringement and unfair competition by defendant are alleged to exist because defendant "adopted the same merchandising plan and program"; "adopted the trademark 'The Tie with the Fashion Guide'", and the trademark "Fashion Guide" and used them in defendant's "merchandising plan and program". Damages in excess of $10,000 are alleged, and injunctive relief and an accounting are sought.

### Color Harmony and History of the Tie Industry.

Dating from the 1930's, delineation of the color of the tie that could fashionably be worn with various colored shirts or suits, and combinations thereof, has had a place in the advertising of necktie manufacturers. The advertising beginning in the 1930's consisted of (1) national consumer magazine "spreads" featuring, in color, ties matched to suits (e. g., Defendant's Exhibit 1; Arrow, "with * * * suit, wear * * * shirt, * * * tie, and * * * handkerchief"; McCurrah, "For your * * * suit—with * * * shirts" [then a photograph of various colored ties to match]); (2) booklets or charts published by the tie manufacturers which indicated harmonious color combinations; (3) "riders" or hangers through which the ties were placed which indicated, in various word combinations, the color of suit with which the tie could correctly be worn (e. g., "colors of tie planned to be worn with * * * shirt" or "this tie is smart with * * * suits," —Calcutta Ties—Climax Neckwear); (4) "spreads" in retail trade publications similar in message to (1) but primarily appealing to the retailer's desire for easier sales rather than to the consumer's color consciousness. It appears, although the evidence on this point is not clear or unconflicting, that the color harmony message was sparsely used in the early 1950's, and that the manufacturers who had earlier featured that sort of advertising had drifted into oblivion. However, continuing into the early 1950's magazines aimed at the consumer (Esquire) and the retailer (Men's Wear) would indicate harmonious color combinations, with the trade publications featuring advertisements showing a salesman from a prominent store giving advice on how to sell ties. The promotion of color to harmonize with a suit was always suggested in such advertisements.

### Wembley and "Color Guide."

Wembley, one of the largest of about one hundred tie manufacturers in the United States, with gross annual sales of between five and ten million dollars, was organized in 1936 and has its home office in New Orleans, Louisiana. Just before the Christmas season in 1950 Wembley became concerned with dropping neckwear sales throughout the industry. In order to investigate this decline and thereby to gain insight into, and if possible, to increase sales, Wembley placed a member of its Research Department in the men's department of a large New Orleans department store to serve as one of the sales personnel and to note "what she found out about the sales of neckwear during [the Christmas] period." (Transcript, page 243). Through this means Wembley learned that "the great majority of the people who bought neckwear were interested in what color suit the neckwear should be worn with." As a result of this information Wembley began a program to promote color harmony in 1951.

The first Wembley color promotion was the merchandising of a wardrobe set of three ties, each to be worn with a suit of a different color. This promotion was discarded in favor of placing on individual ties a rider or hanger indicating the color suit with which the tie should be worn. These riders or hangers helped display the tie at the retail level and were being used for display purposes by other manufacturers (Transcript, page 555), but without the color information, at the time Wembley introduced its display and information riders or hangers. Wembley promoted its color concept through these riders from 1952 to 1954, and the "wear with" theme became a feature of Wembley advertising at this same time.

Because the, paper or plastic, riders or hangers were usually discarded by the consumer upon the first use of the tie, Wembley believed its color promotion did not "carry very well with the consumer." To remedy this, S. E. Pulitzer, E. S. Pulitzer and one Hausser, respectively, Wembley's President, Vice President and former advertising manager, devised a color guide promotion in which

the rider or hanger on the tie called attention to the "Color Guide", a fabric label sewn on the tie to indicate the color of the suit with which the tie should be worn. On the rider was the phrase "The Tie with the 'Color Guide' ", or "Color Guide" and the sewn label stated "Wear with * * * (color of) suit." The phrase "Color Guide" and the permanent label with color information first appeared in August of 1955, the permanent label being designed primarily to carry the color information to the ultimate consumer as distinguished from the retailer or the purchaser. Wembley claims to have been the first tie manufacturer to attach permanent labels bearing color information. However, labels of all kinds have been sewn on garments of all kinds for many years to indicate the manufacturer, the material of which the garment is made and/or the size of the garment.

Since 1954 Wembley has expended $227,685 on labels and $242,421 on riders, chiefly for the Color Guide promotion. Wembley has sought to promote its ties through a substantial amount of national advertising directed to the consumer;[1] advertising in retail trade journals, such as Men's Wear, Daily News Record, California Men's and Boy's Style, and advertising through TV commercials on the Bob Pettit, professional football, and Jack Paar shows. Wembley has designed display racks and display cards, engaged in direct mail advertising to the retailer, and made available cooperative advertising (retailer sharing cost of advertising featuring fact that Wembley is sold in retailer's store). The major proportion of this advertising has included the Color Guide promotion, but with that feature of the tie often being given subordinate billing to another feature, such as wrinkle resistance or wash

and wear. The current Wembley advertising features color.

Endeavoring to protect its trademarks, Wembley, in addition to its two United States registrations, registered "Color Guide" as a trademark with the Commonwealths of Australia, New Zealand and Canada. Moreover, by letter dated September 18, 1959 Wembley objected to the use by A. Schreter & Sons Co., Inc., of Baltimore, Maryland, of a paper rider placed on neckties bearing the following wording:

"COLOR COORDINATED TIE See
Label for suit to wear with
this tie."

Nor has plaintiff been less diligent in asserting violations of its alleged rights by defendant.

### Diplomat and "Fashion Guide."

The Miller brothers have, as partners, been manufacturing ties with the Diplomat label since August 1, 1945. However, Samuel Miller, one of the partners, asserted his personal entry into the tie business in 1932. Diplomat, a Baltimore firm of much smaller size than Wembley (Transcript, page 527), manufactures ties under various labels. Approximately fifty per cent of defendant's ties bear the Diplomat label. Thirty five per cent are manufactured for Belk Stores, with the Archdale label. Another fifteen per cent are given the label of the individual store which retails them, e. g., Hochschild-Kohn, etc.

In 1955, a point in time after Wembley had begun its "Color Guide" promotion but before the mark "Color Guide" had been registered on the Principal Register, the Miller brothers began to manufacture ties bearing permanent labels indicating with what color suits the ties were to be worn. The idea of selling a tie with such a label came from Samuel

---

1. Look (1953–1955), Life (1945–1958), Holiday (1948–1960), Yale Record (1952–1956), Saturday Evening Post (1938–1956), Collier's (1939–1956), Sports Illustrated (1950 to date), Vogue (1950 to date), Chicago Tribune, Los Angeles Times, Miami Herald, Mademoiselle (1950 to date), Seventeen (1950 to date), Harper's Bazaar (1950 to date), Charm (1950–1956), Field and Stream (1950–1956), New York Times (1948 to date), and Good Housekeeping (1957–1959).

J. Miller, who was familiar with Wembley's attaching of a color information label to its ties at the time he suggested the idea. Samuel J. Miller indicated in response to a question put by the court, that he studies everybody in the same line of business and, if he feels they have a good merchandising idea which is not protected, he will urge Diplomat to use the idea. (Transcript, page 97). He referred to such approach as common to the trade. Samuel J. Miller further indicated that when he saw the Wembley "Color Guide" promotion, his response was that it was "nothing new" (Transcript, page 102), but merely a new twist to an old merchandising approach he had first seen in his early days in the tie business. He did testify, however, that, while the fact that Wembley used "Color Guide" with a sewn label was a factor in his recommendation to Diplomat that they sew in labels and indicate on the rider their presence and their information (Transcript, page 58), his ultimate selection of "Fashion Guide" as Diplomat's trademark was not affected by the way Wembley advertised. (Transcript, page 107).

When questioned regarding the effect Wembley advertising would have on one who saw a Diplomat "Fashion Guide" tie, Mr. Miller indicated that the consumer would be "influenced to an extent." (Transcript, page 74).

To indicate on the rider that the tie bore a special information label, Diplomat began to use the phrase "Color Key Holder." After using this phrase for five to six months, Diplomat dropped it upon receiving a complaint by Wembley and inaugurated, in 1956, the phrase "Fashion Guide Ties." Diplomat also used the slogan "The Tie with the Fashion Guide" but abandoned that phraseology on advice of counsel after Wembley complained of the similarity to "The Tie with the Color Guide."

Diplomat has also on its rider the phrase "Featured in Esquire." Nathaniel Miller who has responsibility for Diplomat's advertising was unable to produce any Diplomat ad in Esquire since 1958. (Transcript, page 623). A Diplomat ad in Esquire (December, 1956) stated "the Fashion Guide tells the color of suit to go with tie." (Plaintiff's exhibit 66).

Diplomat has spent approximately $55,000 on the "Fashion Guide" promotion with the bulk of its advertising being directed at the retailer. In direct mailings and store fixture cards "Fashion Guide" is mentioned from one to four times but it is often subordinated to other features, such as button hole ties and wash-and-wear.

Diplomat registered "Fashion Guide" as a trademark on the Supplemental Register on July 26, 1960 (Registration No. 702,017) Wembley filed cancellation proceedings and a decision on the question of confusion between "Fashion Guide" and "Color Guide" has been postponed by the Patent Office pending the outcome of this suit.

### Shoppings.

In preparation for trial Wembley engaged a market research organization to make shoppings in Virginia and Maryland. The actual shopping was done by Mrs. Fay Kaufman and Mrs. Helen Lipson.[2] The shoppers were sent to the stores by one Mrs. Taylor who was not a witness. The shoppers were directed to enter the stores selected by Mrs. Taylor and to ask to see a Color Guide tie. If asked what they meant, the shoppers were to say they had seen it on TV and in the leading magazines.

The shoppings undertaken by Wembley present several evidentiary problems. Defendant Diplomat challenged the admissibility of the shopper's testimony on grounds of (1) hearsay, (2) failure to

2. Shoppings were made by Mrs. Kaufman at Leggett's in Culpepper and Charlottesville, Virginia and at Schwartzenburg's in Cumberland, Marvin's in Oakland and the Cressmont Shop in Frost-burg, Maryland. Mrs. Lipson shopped at Leggett store in Orange, Virginia and at Lee Johnson's and Powell's in Salisbury, Maryland.

establish that the stores chosen to be shopped were picked at random, and (3) insufficient notice of plaintiff's intent to produce this evidence.

■ The hearsay objection to evidence of a research survey found early support in Elgin National Watch Co. v. Elgin Clock Co., D.C.D.Del.1928, 26 F.2d 376, 377. The attitude of the courts has shifted in the intervening thirty four years and courts now admit into evidence a research survey on the basis that either the testimony of the interviewer contains no hearsay (United States v. 88 Cases, More or Less, Etc., 3 Cir. 1951, 187 F.2d 967, 974, cert. den. 1951, 342 U.S. 861, 72 S.Ct. 88, 96 L.Ed. 648) or that the testimony falls within the hearsay exception for utterances of a third person showing his state of mind. (Marcalus Manufacturing Co. v. Watson, D.C. D.C.1957, 156 F.Supp. 161, 164, aff. C.A. D.C.1958, 103 U.S.App.D.C. 299, 258 F.2d 151.) Law Review writers, although arguing for admissibility, recognize the split in authorities as to the reason for admissibility. See Note, "Consumer Polls as Evidence in Unfair Trade Cases," 20 Geo.Wash.L.Rev. 211, 224 (1951); Note, "Public Opinion Surveys as Evidence: The Pollsters Go to Court," 66 Harv.L.Rev. 498, 502–503 (1953); Sorenson & Sorenson, "The Admissibility and Use of Opinion Research Evidence," 28 N.Y.U.L.Rev. 1213, 1216, 1219, 1232 (1953).

In the leading case on the subject of the admissibility of survey research, United States v. 88 Cases, More or Less, Etc., 3 Cir. 1951, 187 F.2d 967, the question at issue was whether a certain beverage was "adulterated" in the sense that it was made to appear better than it was. The Government introduced the collated answers of 3,539 persons questioned to determine what they thought was contained in the product. The court said:

> "Many objections were made to the manner in which the surveys were taken. The principal contention, however, was that the surveys were hearsay and therefore inadmissible.

The hearsay objection is unfounded. For the statements of the persons interviewed were *not offered for the truthfulness of their assertions* as to the composition of the beverage. They were not offered to prove that Bireley's Orange Beverage is or is not orange juice. They were *offered solely to show as a fact the reaction* of ordinary householders and others of the public generally when shown a bottle of Bireley's Orange Beverage. *Only the credibility of those who took the statement was involved, and they were before the court.* The *technical adequacy* of the surveys was a matter of the *weight* to be attached to them." (Id., 974.) (Emphasis supplied.)

Survey evidence has been admitted on the reasoning of the Orange Beverage case, above, in Standard Oil Company v. Standard Oil Company, 10 Cir. 1958, 252 F.2d 65, 75, 76 A.L.R.2d 600; Household Finance Corp. v. Federal Finance Corp., D.C.D.Ariz.1952, 105 F.Supp. 164, 166. See also Girl Scouts of United States of America v. Hollingsworth, D.C.E.D. N.Y.1960, 188 F.Supp. 707; Arrow Metal Products Corp. v. Federal Trade Com'n., 3 Cir., 1957, 249 F.2d 83, 84.

The Orange Beverage case would meet defendant's hearsay objection, support the admission of the shoppings into evidence and relegate the failure-to-show-random-selection-argument to the question of probative value, not admissibility. A case which requires more in the way of safeguards of the reliability of survey testimony than the standard of the credibility of the interviewer, set out in the Orange Beverage Case, is American Luggage Works v. United States Trunk Co., D.C.D.Mass.1957, 158 F.Supp. 50, aff. sub nomine Hawley Products Company v. United States Trunk Co., 1 Cir. 1958, 259 F.2d 69, where Judge Wyzanski wrote:

> "It is, of course, clear that the testimony of the investigators as to what interviewees said is offered to show not the truth of what the

interviewees said but to show their state of mind. Some authorities have, therefore, concluded that the testimony is not hearsay. [citations omitted]. Others, however, have noted that the proffered evidence has some of the dangers of hearsay. [citations omitted]. So long as the interviewees are not cross-examined, there is no testing of their sincerity, narrative ability, perception, and memory. There is no showing whether they were influenced by leading questions, the environment in which the questions were asked, or the personality of the investigator. But where a court is persuaded that in a particular case all these risks have been minimized, that the answers given by the interviewees are, on the whole, likely to be reliable indicia of their states of mind, that the absence of cross-examination is not prejudicial, and that other ways of getting evidence on the same point are either impractical or burdensome, the testimony should be admitted. * * * In this case these conditions have been met." (158 F.Supp. at page 53).

Several cases have admitted survey evidence and pointedly noted that the surveys were not relied upon in arriving at the decision. See Du Pont Cellophane Co. v. Waxed Products Co., D.C.E.D.N.Y. 1934, 6 F.Supp. 859, 885, modified without discussing admissibility, 2 Cir. 1936, 85 F.2d 75; Admiral Corp. v. Penco, Inc., D.C.W.D.N.Y.1952, 106 F.Supp. 1015. A recent case, Sears, Roebuck & Co. v. All States Life Insurance Co., 5 Cir. 1957, 246 F.2d 161, 171, cert. den. 1957, 355 U.S. 894, 78 S.Ct. 268, 2 L.Ed.2d 192, which held survey evidence to be hearsay and inadmissible, is distinguishable from the instant case in that the trial court, without objection, did not allow the interviewers to testify in that case, whereas here they testified and were cross-examined.

■ It is concluded from this series of citations that the surveys were not

inadmissible hearsay, but admissible either to show as a fact the reaction of the salesman to the request for a "Color Guide" tie or as evidence of the salesman's state of mind upon being asked for a "Color Guide" tie and thus, within an exception to the hearsay rule. The fact that the mysterious Mrs. Taylor was never produced to explain how the stores were selected does not render the shoppings inadmissible but rather impairs the probative value of the evidence. As the court finds the failure of the plaintiff to put Mrs. Taylor on the stand to be highly indicative of the fact that the shoppings were not a true random selection, the defendant can hardly complain that the survey evidence, although admissible, is of slight, if any, probative value.

■ The most strenuously urged objection to the testimony of the shoppers (as well as that of Murray Glickman and Alfred Hanson, two other witnesses for the plaintiff) is that it came as a surprise to the defendants since the existence of these sources of evidence was not divulged in plaintiff's answers to defendant's interrogatories, and thus the answers constituted a violation of the Federal Rules of Civil Procedure.

Rule 33 requires that interrogatories be answered separately and fully in writing under oath. Rule 37(b) (2) (ii) authorizes an order by the court prohibiting the introduction into evidence of matter withheld by a party in disregard of an order of the court compelling an answer. Rule 37(d) allows the court to strike out part of the pleadings or dismiss the action or enter a default judgment where a party wilfully "fails to serve answers to interrogatories submitted under Rule 33."

Plaintiff replied to defendant's interrogatories approximately two years before trial, answering to the best of its knowledge as of that time. Its shoppings were not made until less than two weeks before trial. After the evidence objected to was presented in court by the plaintiff on three successive days, the completion of the case was post-

poned for approximately eight weeks due to illness of counsel, the pendency of criminal cases having priority on the court docket, and other matters specially set on the court calendar. Upon resumption of the trial, plaintiff concluded its case and defendant proceeded with its presentation. During the eight weeks which elapsed between the two sessions of the trial, no effort was made by defendant's counsel to obtain an order from the court requiring more definite answers, no effort was made to serve additional interrogatories on the plaintiff or to obtain any other relief. Defendant did not seek to take the depositions of those interviewed by plaintiff or to make its own shoppings. It was not until the last day of trial that defendant moved to strike all testimony and exhibits introduced by plaintiff during the trial to which objection had been made as "being in violation of the Federal Rules of Civil Procedure."

■ There are four grounds for denying defendant's motion to strike. The first is that Rule 37(b) (2) (ii) comes into operation only when a party has refused to obey *an order of the court* compelling an answer to the interrogatories. Maurer-Neuer, Inc. v. United Packinghouse Workers of America, D.C.D.Kan.1960, 26 F.R.D. 139, 140; Southard v. Pennsylvania Railroad Company, D.C.E.D.Pa.1959, 24 F.R.D. 456, 457; 2A Barron & Holtzoff, Federal

Practice & Procedure, § 851, page 526.[3] No such order of the court has been flouted in this case, and, therefore, the relief asked i. e., striking the testimony, should be denied.[4]

■ Second, relief under Rule 37 is discretionary. Michigan Window Cleaning Co. v. Martino, 6 Cir. 1949, 173 F.2d 466, 468. Of course, the discretion must be exercised in a judicious manner. It will be noted that relief has been called justified only in the exceptional case, i. e., where the recalcitrant party has acted in wilful disregard of, or with gross indifference to, an order of court requiring discovery or with such deliberate callousness or negligence as to occasion an inability to comply with the court's order. (Campbell v. Johnson, D.C.S.D. N.Y.1951, 101 F.Supp. 705, 707). There is no such conduct on the part of the plaintiff in the instant case.

■ Thirdly, defendant had almost two months from the time the evidence was given in open court to the time it was called upon to present its case, the case being in recess during that time. This factor weighs heavily in denying the relief sought by defendant. "Failure of a party to give his opponent the added information [which became available after the interrogatories were originally answered] should be ground for refusing to allow an unnamed witness to testify, *or for granting* a *continuance*, or for a

---

3. "Rule 37 deals with the consequences of failure to make discovery. * * * The rule is that sanctions can be applied *only for failure to comply with an order of the court.* * * * Where the discovery procedure is one set in motion by the parties themselves without court order, the party seeking discovery must first obtain an order under Rule 37(a) requiring the recalcitrant party or witness to make the discovery sought; *it is only violation of this order which is punishable under Rule 37(b)."* (Emphasis supplied.)

4. The only exception in Rule 37 to this requirement of a court order before relief may be granted, is in subsection (d) which permits sanctions where there has been a wilful failure by certain speci-

fied persons to answer interrogatories. 2A Barron & Holtzoff, Federal Practice & Procedure, § 851, page 526.
 "Rule 37(d) should not be applied to the situation in this cause in which answers were served, even though certain of said answer may be insufficient to satisfy the provisions of Rule 33 for the reason that they do not constitute full answers which that Rule requires. * * *. Such non-compliance does not evidence the degree of conscious and intentional failure which would justify the drastic remedies of Rule 37(d)." Cardox Corporation v. Olin Mathieson Chemical Corp., D.C.S.D.Ill.1958, 23 F.R.D. 27, 29.
 Relief under that provision is discretionary. Craig v. Far West Engineering Company, 9 Cir. 1959, 265 F.2d 251, 260, 72 A.L.R.2d 1143.

new trial, *as may seem just.*" (2A Barron & Holtzoff, Federal Practice & Procedure, § 777.1, page 389, emphasis supplied). The recess here was analogous to and had the same effect as a continuance and served to give the defendant more than adequate opportunity to obtain evidence to rebut or diminish the credibility of the objected to matter. Accordingly, the recess alone is a sufficient reason for denying defendant's motion to strike.

Fourthly, the court has considered the relative benefit to the defendant had plaintiff's answers to defendant's interrogatories been brought up to date two weeks before the trial as compared with the possible substantial detriment to the plaintiff should the motion to strike be granted at this time. Defendant had notice before trial that shoppings had been made; detailed information relative to the shoppings would have been supplied verbally by counsel for plaintiff; and in the final analysis the eight-week recess gave defendant all of the benefits to which it was entitled. No substantial right of the defendant was affected. (Bell v. Swift & Co., 5 Cir., 1960, 283 F.2d 407). On the other hand, to strike most, if not all, of plaintiff's testimony on the issues of secondary meaning and likelihood of confusion at this point in the case could conceivably have been disastrous to plaintiff's successful maintenance of its suit; or the record on appeal. In such a situation were the court otherwise in doubt as to the proper ruling, which it is not, the doubt should be resolved in favor of the plaintiff.

For the aforementioned reasons the defendant's motion to strike is hereby denied.

The shoppings may be summarized as follows:

*Mrs. Kaufman at Leggett's in Charlottesville, Virginia.* When approached by a salesman, Mrs. Kaufman asked to see an "Archdale[5] tie, please, a Color Guide tie." (Transcript, page 26; emphasis supplied). The salesman responded "Archdale?" and repeated "Color Guide?". Then directing the shopper to a tie rack he said, "Well, all our ties have Color Guide on them." The salesman stated that he knew what the shopper meant, that the store was waiting for "them" to come in and explained that "they" were little cards which were stuck down in the pockets of the suit and which told what to wear with what suit. At the tie rack Mrs. Kaufman was shown an Archdale and a Wembley tie. *She chose the former.*

*Mrs. Kaufman's Maryland shoppings.* When she asked for a Color Guide tie, she was taken directly to the Wembley display, and ultimately purchased a Wembley tie. This does not mean that in the Maryland stores clerks associated "Color Guide" with Wembley. It merely indicates that the stores shopped in Maryland were not chosen as the result of a random sample. Plaintiff's counsel advised the court that Diplomat ties are not widely sold in Baltimore or in the Baltimore area. Admittedly, a number of the stores shopped in Maryland did not sell Diplomat ties.[6]

*Mrs. Kaufman at Leggett's in Culpepper, Virginia.* Upon Mrs. Kaufman's entering the store and posing the question, the salesman repeated the phrase "Color Guide" in a questioning manner and then took out an Archdale Fashion Guide chart indicating color of ties to be worn with various colors of suits. The

---

5. The question, as asked, was directly contrary to instructions purportedly given the shopper. If "Color Guide" denotes more than a service feature, i. e., the presence of a label on ties offering color guidance; if "Color Guide" means to retailers, purchasers and consumers a Wembley tie, then the question was ambiguous, confusing and misleading. Archdale is the name under which defendant manufactures its ties for Belk Stores. Under plaintiff's own theory what in effect the shopper was asking for was a Diplomat (Archdale) Wembley tie.

6. Statement of plaintiff's counsel. (Transcript, page 291).

salesman picked out four or five Archdale ties from which Mrs. Kaufman made her selection. No Wembley ties were displayed at the store.

*Mrs. Lipson's shopping at the Leggett store in Orange, Virginia.* The saleslady, when told Mrs. Lipson wanted a Color Guide tie, looked puzzled, asked her to repeat her desire, and then asked if she meant "those ties with the little tag on the back of them that had color that you wear, that tells you what to wear with it." (Transcript, page 294). The saleslady showed Mrs. Lipson some pre-tied neckties but the buyer rejected them. Mrs. Lipson was then accompanied to some other tie racks where all the ties viewed were Archdale and where an Archdale tie was purchased.

*Mrs. Lipson's shoppings in Salisbury, Maryland.* At Lee Johnson's the salesman was puzzled at the request for a Color Guide tie. The salesman showed several ties with a color advice label on the back, all Prince Consort ties by the Schreter Company. At the Powell store the sales clerk did not understand what the shopper wanted. The buyer for the store, when approached, said that they had no Color Guide ties, that such ties were made by Wembley, that he would help the shopper to select a harmonious color if she wished and that the Wembley tie might be purchased "across the street." (Transcript, page 308).

The significance of the survey testimony in respect to the issues of likelihood of confusion and secondary meaning will be discussed later in this opinion.

### Parties' Contentions.

Wembley asks that Diplomat be enjoined (1) from using in any way on neckties or other articles of clothing the words "Fashion Guide" and "The Tie With The Fashion Guide," or any rearrangement thereof; and (2) from using a fabric label permanently attached in any way to the necktie and bearing "wear with" wording.

Wembley argues that its trademark "Color Guide" has been infringed by Diplomat's use of "Fashion Guide"; that

the infringement arises from the likelihood of confusion as to the source of origin of its neckties caused to the ordinary purchaser shopping with ordinary caution who is confronted by "Fashion Guide" after the intensive "Color Guide" advertising; that Diplomat as second comer in the "Guide" field is required to advertise its product in such a way as to avoid all possible confusion; and that any distinction between "color" and "fashion" in the context of this case is too fine to avoid all reasonably possible likelihood of confusion to the purchaser. Wembley also contends that it was the first tie manufacturer to put a permanent label onto its tie indicating thereon the color of the suit to wear with it; that this label is a non-functional feature of a tie and thus capable of exclusive appropriation by Wembley; and that Diplomat may not similarly attach a permanent label giving color advice which may cause or permit a purchaser to confuse the Diplomat and Wembley ties.

Diplomat replies that Fashion Guide and Color Guide are so different in sound, appearance and meaning as to render confusion unlikely; that to protect a trademark which is essentially descriptive in nature the one seeking protection must show that the trademark has acquired a secondary meaning; that the non-patented use of the fabric label by Wembley caused it to fall into the public domain where Diplomat was free to pick it up and use it; that the court is not confronted with a "dress of merchandise" (or packaging) case; and that the fabric labels have functional utility due to their continuing advice to the wearer and thus are not susceptible of appropriation by Wembley.

### Trademark Infringement.

Plaintiff's registration of "Color Guide" on the principal register is prima facie evidence of the validity of the registration and of the registrant's exclusive right to use the mark in commerce, 15 U.S.C.A. § 1057(b), and, after continuous use for five consecutive years

following registration, the mark becomes, with certain exceptions, incontestable, 15 U.S.C.A. § 1065. At the time the instant suit was filed this five year period had not run. Although defendant did not raise the issue of the validity of plaintiff's trademark in its answer to the complaint, the issue was, in fact, raised and tried by implied consent of the parties. Defendant strenuously argued, and submitted evidence to support its position, that (1) "Color Guide" is a descriptive term incapable of designating origin and (2) "Color Guide" is a designation descriptive of a functional feature or element of plaintiff's ties. Either contention, if proven, would compel a conclusion that plaintiff's mark was improperly registered. Accordingly, a determination of the validity of the "Color Guide" trademark is required and is authorized by Rule 15(b), F.R.Civ.P., 28 U.S.C.A.

The evidence showed that the name "Color Guide" refers to the label on the necktie telling what color suits to wear with the necktie and not to the necktie itself, contrary to the merchandise statement in the trademark registration. Plaintiff's own advertisements (Plaintiff's exhibit No. 57) clearly attest to this fact. Such language as the following appears:

> "This is the tie with the Color Guide that 'takes the guessing out of dressing.' Every tie comes with a small label on the inside telling which color suit it should be worn with—blue, gray, brown." (Washington Post, November 23, 1960).

> "Wembley's Color Guide assures correct match with suits." (Binghamton Press, June 17, 1960).

> "Look for the Wembley Color Guide * * * The *Color Guide Label* on the other side of every Wembley shows which tie correctly blends with his suit." (Vallejo Times—Herald, March 23, 1961; emphasis supplied).

That "Color Guide" refers to the label is further conclusively demonstrated by

a Wembley advertisement in Men's Wear on October 8, 1954, in which the statement "Look for this Color Guide on Wembley ties" is connected by an arrow to a photograph of a label attached to a tie. (Defendant's exhibit No. 26).

The term "Color Guide" as referring to a label giving color advice or guidance, not to a tie itself, is neither distinctive, arbitrary or suggestive. It merely describes the label and the information that it contains. It is a highly descriptive term and as such should be available to anyone for use in describing a similar label unprotected by any patent or copyright. In J. Kohnstam, Ltd. v. Louis Marx & Company, Inc., C.C.P.A. 1960, 280 F.2d 437, an opposition proceeding dealing not with unpatented labels attached to goods but rather with containers of, or packaging of, goods, appellant sought the registration of "'Matchbox' Series" on the Principal Register as a trademark for model toys packaged in small boxes designed to resemble matchboxes. The court adopted the opposer's position that "All who want to sell miniature toys in a matchbox should be free to do so, and all who *do* so should have the right to *say* so" (280 F.2d at page 438) and rejected the argument that "'Matchbox' Series" was not descriptive of toys saying "[w]e give no weight to this argument for, while it may be literally true, it does not hold with respect to a series of toys sold in simulated matchboxes." (280 F.2d at page 440). The Lanham Trade-mark Act, 15 U.S.C.A. § 1052(e)(1), specifically prohibits the registration of a descriptive mark on the Principal Register. Registration on the Supplemental Register should likewise be denied unless the mark is capable of distinguishing the applicant's product. (15 U.S.C.A. § 1091). That the alleged mark is not descriptive of the entire article but rather only of the color advice label is immaterial. (Sylvania Electric Products v. Dura Electric Lamp Company, 3 Cir., 1957, 247 F.2d 730, 733; Goodyear Tire & Rubber Company v. Robertson, 4 Cir., 1928, 25 F.2d 833, 834). "Color Guide", a descriptive

mark, should have been denied registration on the Principal Register.

■ "Color Guide" is subject to another, and fatal, infirmity. Plaintiff attempted to argue throughout the trial that a fabric label attached to a tie guiding the user's choice of proper color of the suit with which to wear the tie is a non-functional feature of the necktie because it does not contribute to the normal intended use of the necktie "which is to be tied around the neck." It requires no extended discussion to point out that a necktie is in the class of decorative apparel and as such its color and its harmonious coordination with other colors is of first importance. Plaintiff's own witness, Mr. Saul Hirsch, the associate buyer of Landsburg's Department Store in Washington, D. C., testified that color is the prime factor in the sale of a necktie. Plaintiff's statement that "wear with" labels provide "continuing advice to the user" is an admission that the label is a functional and utilitarian feature of the necktie.

> "A feature of goods is functional * * * if it affects their purpose, action or performance, or *the facility* or economy *of* processing, handling or *using them*; it is non-functional if it does not have any of such effects." (A.L.I.Restatement, Torts, Section 742, [1938]; emphasis supplied).

The label performs a function which, if the label were absent, would depend solely on the color conscious memory of the wearer. The use of the tie, that is not just the wearing of it but the wearing of it in a harmonious color combination with a suit, is thus facilitated.[7] The court concludes, as the evidence and the whole tenor of plaintiff's claim require, that a label permanently attached to a necktie and giving color guidance becomes a functional and utilitarian element or feature of the necktie.

■ The courts have repeatedly held that a functional feature of an article cannot be registered as a trademark. If the alleged mark consists of *words descriptive of the functional element or feature* of the goods, denial of registration similarly results. A.L.I.Restatement, Torts, section 715 (1938) sets out the applicable rule as follows:

> "A trade-mark is any mark, word, letter, number, design, picture or combination thereof in any form of arrangement, which * * * (c) *is not * * * a designation descriptive of the goods or* of *their* quality, ingredients, properties or *functions*
> * * *." (Emphasis supplied.)

The reason behind the rule has uniformly been recognized by the courts as being to prevent the grant of what in effect would be a perpetual monopoly "by the issuance of a trade-mark in the situation where a patent * * * cannot be granted. See in re Walker-Gordon Laboratory Co., 1931, 53 F.2d 548, 19 C.C.P.A. Patents 749." (Sylvania Electric Products v. Dura Electric Lamp Company, 3 Cir., 1957, 247 F.2d 730, 732).

It was evident throughout the trial that plaintiff was attempting through the trademark registration statutes to obtain protection of, and to acquire a monopolistic standing in regard to, the attaching of permanent fabric labels on neckties. This it could not do under the provisions of the patent and copyright laws. This it should not be allowed to do indirectly under the trademark laws. The plaintiff took great care during the trial to demonstrate how diligent it had been in obtaining all possible protection for its rights in the fields of patents, trademarks and copyrights. (Transcript, pages 465–469). It is inconceivable that, as aware as plaintiff showed itself to be of its need for "protection" of its rights, plaintiff failed to obtain a patent or a copyright where one could have been

---

7. This function is not necessarily always performed. Chief counsel for Wembley appeared in court wearing a Wembley tie with a label giving guidance as to color, but a suit not of a recommended color!

secured. Whether or not the admonition to the wearer to "wear this tie with" (the appropriate color suit) was copyrightable, no copyright was obtained. Nor does plaintiff claim any patent covering the labels themselves.

Moreover, from the very outset of this case, it has been crystal clear that plaintiff has been and is attempting to secure protection of its alleged "merchandising plan and program." The court was furnished no authority to support a claim that a "plan" as such is entitled to protection where no misrepresentation of origin is made, and no secondary meaning has been acquired.[8] Contrary to plaintiff's contention see: Nims, Unfair Competition and Trademarks, 3 ed., Vol. 2, par. 289, page 947; Reddy Kilowatt, Inc. v. Mid-Carolina Electric Cooperative, Inc., 4 Cir., 1957, 240 F.2d 282; Laskowitz v. Marie Designer, Inc., D.C.S.D.Cal.1954, 119 F. Supp. 541; Affiliated Enterprises, Inc. v. Gruber, 1 Cir., 1936, 86 F.2d 958; Kaeser & Blair v. Merchants' Association, 6 Cir., 1933, 64 F.2d 575. Apparently recognizing that a plan per se is not susceptible of protection, plaintiff has asserted its alleged trademark rights in such a manner as to seek to acquire through indirection what it cannot secure directly. Were this court, contrary to the general rule prohibiting the registration of functional marks, to hold valid plaintiff's designation which is merely descriptive of a functional or utilitarian feature of plaintiff's ties, then plaintiff's entire merchandising plan and program could quite possibly be brought within the encompassment of a legally recognized, protectable interest or right. That such a fear is not without foundation is evidenced by Wembley's successful attempt to stop the use by its competitor, Schreter & Sons, of the wording on *a paper rider*, "Color-Coordinated Tie— see label for suit to wear with this tie." Wembley introduced into evidence the letter that it addressed to its competitor demanding cessation of color harmony promotion in which it was stated that Wembley had "conceived an *entire merchandising plan* built around the trademark Color Guide, the slogan the tie with the Color Guide and the label affixed to each necktie telling the color of suits with which the necktie could be worn most suitably." (Emphasis supplied.) Plaintiff likewise was successful in forcing the defendant to discontinue the use of the phrase "Color Key Holder."

In a case factually quite similar to the instant one, the Court of Appeals for the Third Circuit in reliance upon a decision of the Court of Appeals for the Fourth Circuit reached a determination that the registration of the trademark before it was invalid because of its functional feature and because it was descriptive of goods within the prohibition of Title 15 U.S.C.A. § 1051 et seq. The analysis by that court of the case before it based upon the opinion of the Fourth Circuit is as follows:

"The specific prohibition of the act denying registration to descriptive marks precludes the valid registration of the blue dot, whether it takes the form of a symbol, as it did here, *or whether the mark be composed of the words 'blue dot.' It is of no significance that the alleged trade-mark may not be descriptive of the entire article, but rather only of the blue dot feature.* Perhaps the closest case in point is Goodyear Tire & Rubber Co. v. Robertson, 4 Cir., 1928, 25 F.2d 833. There a bill in equity was filed pursuant to statute to require the Commissioner of Patents to register as a trade-mark a diamond-shaped symbol representing the impression used by complainant on the tread of the tires it manufactured. *The court upheld the denial of registration of the mark, since although it might have indicated the source of origin, it did perform a utilitarian function.*

8. If a "plan" as such were protected, there could be only one system of trading stamps; one frozen food plan; one radio give-away program; and perhaps only one political platform.

Further, the court held that the mark was descriptive of the goods in prohibition of the act, *notwithstanding the fact* that appellant had argued *that the symbol did not describe the tire itself, but rather only part of the tread.* And *if the alleged mark were the words 'diamond-shaped tread,' registration would certainly be denied* as descriptive of the goods." (Sylvania Electric Products v. Dura Electric Lamp Company, 3 Cir., 247 F.2d 730, 733; emphasis supplied).

The Sylvania case and the Goodyear Tire & Rubber case are authority for this court's conclusion that the registration of "Color Guide" should have been denied.

■ All that has been said in regard to "Color Guide" applies with equal force to "The Tie with the Color Guide." Indeed the fact that the latter slogan was denied registration on the Principal Register, the plaintiff subsequently being able only to obtain registration on the Supplemental Register, indicates that "The Tie with the Color Guide" is even more descriptive in nature than "Color Guide." The supplemental registration should have been denied on the ground that the slogan is a designation descriptive of a functional feature of plaintiff's goods.

As registration of plaintiff's marks was invalid, there can be no trademark infringement by defendant.

■ Even had the plaintiff's alleged marks been registerable, plaintiff would not be entitled to the broad relief it seeks. "Color Guide" would be the weakest possible type of mark when used as plaintiff uses it to designate the fabric "wear with" labels permanently attached to its ties. It is not an arbitrary or fanciful phrase. It consists of two ordinary English words and is, as previously stated, merely descriptive of the label and the information contained thereon. Defendant introduced into evidence twenty-four third-party registrations containing the words Color, Guide,

or Fashion, or corruptions thereof, in combination with another common English word. These registrations were all in class 39, "clothing," in which neckties and goods of the same general class are registered. The total number of trademarks using the word "Color" were three, of which two were necktie trademarks. The word "Fashion" or a corruption thereof was registered twelve times, eleven times by necktie manufacturers. The word "Guide" was registered ten times but never by a necktie manufacturer, although always by a manufacturer of goods of the same general class. This latter fact does not indicate that "Guide" is the dominant word in the phrase "Color Guide". Certainly Wembley did not so construe its own alleged mark when it demanded the abandonment of the use of the phrase "Color-Coordinated Tie" by Schreter & Sons and of the phrase "Color Key Holder" by defendant. This construction by plaintiff of its own alleged trademark, although not binding upon this court, is not without significance and indicates that "Color" is the dominant word in "Color Guide". In Sure-Fit Products Company v. Saltzson Drapery Company, 1958, 254 F.2d 158, 45 C.C.P.A. 856, an opposition proceeding, the court in holding that "Rite-Fit" as a trademark for ready made slip covers was not confusingly similar to the prior trademark "Sure-Fit" for identical goods sold in direct competition, noted that its decision was most strongly influenced by the fact that the marks in question were the weakest possible type of mark. Aside from eleven third-party registrations containing the word or suffix "Fit", the court recognized that the word "Fit" was eminently suitable for use in connection with slip covers and was definitely descriptive of a characteristic of the merchandise involved. The applicable principles were stated as follows:

"* * * It is unnecessary to cite the numerous other cases of this court wherein the scope to be given to weak trademarks was discussed. It seems both logical and obvious to

us that where a party chooses a trademark which is inherently weak, he will not enjoy the wide latitude of protection afforded the owners of strong trademarks. Where a party uses a weak mark, his competitors may come closer to his mark than would be the case with a strong mark without violating his rights. The essence of all we have said is that in the former cause there is not the possibility of confusion that exists in the latter case." (254 F.2d 158, 160).

As expressed somewhat differently by Chief Judge Thomsen for the District Court of this District, "Although the classification into strong and weak marks is not determinative of the basic question of likelihood of confusion, it is a factor to be considered." (Huntington National Mattress Company v. Celanese Corporation, D.C.D.Md.1962, 201 F.Supp. 938, 944).

■ "Fashion Guide" and "Color Guide" do not sound alike or appear alike to the eye. For more than twenty-four years prior to Wembley's use of "Color Guide", necktie manufacturers had promoted color harmony and given guidance in regard to proper color combinations. One company, Corsair Neck Wear, had designated such information as "a Color Guide label, sewn on each tie" the time of use of such a designation not being clearly established during the trial. In the abstract, "Fashion" has a different and broader connotation than "Color". "Fashion" might well refer to the width, style or other features of a tie such as wrinkle resistance or wash and wear. That on their face "Fashion Guide" and "Color Guide" are not confusingly similar is evidenced by proceedings in the Patent Office. The issue of confusing similarity has twice been presented to that office, which has twice decided that the phrases are not confusingly similar. Such decisions, while not binding on this court, are at least entitled to consideration. On April 1, 1941 the trademark "Fashion Guide" was registered by a manufacturer of goods of the same general class as plaintiff's and defendant's goods. This trademark was in effect and unexpired at the time that plaintiff adopted "Color Guide" as its trademark. It is reasonable to assume that plaintiff must have believed that "Color Guide" was distinctive from the registered trademark "Fashion Guide" at the time that it obtained its registration of "Color Guide", a belief concurred in by the Patent Office. In addition, when the Patent Office granted defendant's registration on "Fashion Guide" over plaintiff's registration on "Color Guide", the above mentioned prior registration of "Fashion Guide" having been abandoned, the Patent Office again considered the question of confusing similarity and reached the conclusion that no confusing similarity existed. It is, however, only fair to note that "Fashion Guide" as actually used by the defendant refers in fact to a permanent label attached to its ties giving advice as to color harmony. Thus, the only similarity between "Fashion Guide" and "Color Guide" is that both phrases imply or suggest the presence of an informational label. "Obviously it was the purpose of both parties to employ words that are suggestive of the use of the merchandise. In doing so [plaintiff] necessarily foreclosed the possibility of obtaining the scope of protection that a purely arbitrary mark would deserve." (Milwaukee Nut Company v. Brewster Food Service, C.C.P.A.1960, 277 F.2d 190, 191). The lack of trademark significance in "Color Guide" is of controlling importance as to the scope of protection to be granted whether that lack of significance be ascribed to the descriptive nature of the alleged mark or merely to its suggestive nature. Plaintiff cannot through evidence of large sales of its ties with riders or hangers bearing the wording "Color Guide" or through evidence of large expenditures in advertising "Color Guide" preclude the use by others of a phrase suggestive of an unpatented feature giving advice to the wearer of a tie to possible harmonious color combinations. (Milwaukee Nut Company v.

Brewster Food Service, C.C.P.A.1960, 277 F.2d 190). The court concludes that the plaintiff's marks, were they entitled to registration, would, as weak marks, be protected only to a limited and circumscribed extent, and that defendant's use of "Fashion Guide" [9] would not be an infringement of any protectable interest belonging to the plaintiff in "Color Guide" and "The Tie with the Color Guide".

■■■ In any trademark infringement case where a valid mark is alleged to have been infringed, the basic issue of confusing similarity must be considered and resolved. In the instant case the plaintiff has relied heavily on the intent of the defendant as a factor to evidence the likelihood of confusion. Of this, the Restatement of Torts says:

"* * * one may infringe another's trade-mark * * * by adopting a ⸱ confusingly similar designation whether he does so innocently or for the purpose of deceiving prospective purchasers. But *his knowledge or purpose is an important factor in determining whether or not his designation is confusingly similar*. If he adopts the designation in ignorance of the other's trade-mark * * *, the similarity is determined on the basis of other factors. But *if he adopts his designation with the intent of deriving benefit from the reputation of the trade-mark* * * *, his intent may be sufficient to justify the inference that there is confusing similarity. Since he was and is intimately concerned with the probable reaction in the market, his judgment manifested prior to the controversy, is highly persuasive. His denial that his conduct was likely to achieve the result intended by him will ordi-

narily carry little weight. While the actor's intention is thus a factor in determining the likelihood of confusion, *the degree of similarity in appearance, pronunciation or suggestion * * * is a factor in determining the actor's intent when that is in issue*." A.L.I. Restatement, Torts, § 729, Comment on Clause (b): f, [1938]; emphasis supplied).

In the instant case there is no question but that the defendant knew of plaintiff's trademark before it adopted its trademark "Fashion Guide." Indeed, it is likewise clear that defendant was intentionally attempting to compete with plaintiff. However, it must be remembered that knowledge of another's trademark and a deliberate intention to compete are not equivalent to a deliberate attempt to deceive prospective purchasers as to the source of defendant's products. (Norwich Pharmacal Company v. Sterling Drug, Inc., 2 Cir., 1959, 271 F.2d 569, 572, cert. den. 1960, 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739). Wembley, during the course of the trial, attempted to show alleged intentional copying by defendant of plaintiff's "Dacron 100" tie with a rectangle around the 100, of a Wembley red, blue and white rider, and of a Wembley red and yellow rider. There was, however, no evidence that these elements or features were susceptible of sole appropriation by Wembley or that Wembley had acquired any protectible rights in said features. No improper or unfair course of conduct on the part of defendant was established. Wembley attempted to argue that the fact that defendant first adopted the designation "Color Key Holder", which it subsequently dropped when objection was made by Wembley, and that defendant then adopted "The Tie with the

---

9. Defendant long before this suit was filed abandoned the use of "The Tie with the Fashion Guide". Plaintiff did introduce at the trial a tie purchased the preceding day which bore the abandoned slogan. The tie appeared to the court to be shop worn and plaintiff was unable to establish that the tie was one in current or recent production. Accordingly, any issue as to present infringement of plaintiff's trademarks by defendant's past use of "The Tie with the Fashion Guide" is not presented at this time.

Fashion Guide," which phrase was abandoned on advice of counsel, shows defendant's present use of the trademark "Fashion Guide" results from a disregard of advice of counsel or from a decision by defendant that "the game was worth the candle." This contention is obviously without merit. To the court it appears much more likely, in view of Wembley's complaint to Schreter & Sons of its use of the wording "Color Coordinated Tie" and of Wembley's objection to defendant's use of "Color Key Holder" and the subsequent abandonment by both companies of the use of such wording, that defendant, a comparatively small concern in comparison to plaintiff, finally felt compelled to take a stand in support of its use of designations that it honestly believed not to be confusingly similar to plaintiff's marks. After having heard Mr. Miller's testimony, the court finds that the circumstances surrounding the adoption by the defendant of its present trademark do not justify an inference that there is confusing similarity between "Color Guide" and "Fashion Guide" simply because of the fact that defendant knew of plaintiff's alleged trademarks and intentionally attempted to compete with plaintiff in a field admitted to be a highly competitive one.

Affirmative evidence of good faith on the part of defendant is to be found in its registration of "Fashion Guide". The decision of the Patent Office as to the nonexistence of confusing similarity, whether concurred in by this court or not, supports defendant's position that it believed, and had a basis for belief, that "Fashion Guide" was not confusingly similar to "Color Guide". Moreover, an intent to confuse or deceive purchasers as to the source of origin of defendant's ties is negated by the fact that the defendant in its advertising, on its riders and on its hangers gives prominence to the name under which the tie is being sold, i. e. Diplomat or Archdale, the designation "Fashion Guide" being subordinate.

 The actual use in the market place by each of the parties of its respective designation is of prime significance in the instant case. Both "Color Guide" and "Fashion Guide" are used as secondary marks. In its advertising, on its riders and on its hangers, Wembley never uses the words "Color Guide" alone. Wembley is the primary, if not sole, designation of origin. While the Court of Customs and Patent Appeals has repeatedly held that the fact that a secondary mark has been used with other primary marks in the past may not properly be considered on the issue of likelihood of confusion in the future in opposition proceedings (Weco Products Co. v. Milton Ray Co., 1944, 143 F.2d 985, 31 C.C.P.A. 1214; Hat Corporation of America v. John B. Stetson Company, 1955, 223 F.2d 485, 42 C.C.P.A. 1001; Burton-Dixie Corporation v. Restonic Corporation, 1956, 234 F.2d 668, 43 C.C.P.A. 950,), such a rule should not be applied in an infringement suit. In infringement the problem before the court is not possible future likelihood of confusion due to a change in the manner of use of the mark, that is, the possible future use of the secondary mark without using the primary mark thus possibly creating, not eliminating, likelihood of confusion. The matter for determination in the instant case is rather whether likelihood of confusion has existed in the past or continues to exist in the present. It is, therefore, logical and necessary to consider the designations of the parties as actually used. Even a casual glance at the rider or hanger will apprise the purchaser of the manufacturer before apprising him of the color information feature. The *labels* themselves contain only the designations "Wembley" or "Diplomat", no reference to "Color Guide" or "Fashion Guide" appearing thereon. The concurrent use by Wembley and Diplomat of "Color Guide" and "Fashion Guide" as secondary marks in conjunction with "Wembley" or "Diplomat" as the dominant, primary designation of source persuades the court that any possible likelihood of confusion has been substantially diminished or entirely eliminated.

Plaintiff admittedly could not show actual confusion in the minds of the purchasing public. This the plaintiff is not required to do. Instead, Wembley introduced into evidence the testimony of the shoppers to show the likelihood of confusion. But it should be noted that the survey was not directed to the reactions of the ordinary prospective purchaser. It was rather directed to, and elicited, the responses of sales personnel, presumably a trained group aware of, and alert to, the various merchandising plans and programs co-existing in the market place. The group chosen by plaintiff to be surveyed is highly significant. It was a group consisting of employees of retailers whose patronage plaintiff had sought over a period of years through intensive advertising in trade journals. As early as January 1956 Wembley had initiated a "Trade Excitement" advertising program aimed at necktie retailers. Purchases of Wembley ties by the retailer were solicited by such representations as "The Wembley Color Guide—Saves Clerk's Time, Sells Ties Quicker, Assures Customer Satisfaction, Avoids Exchange of Gift Ties," and "Wembley Color Guide on every Wembley Tie works to increase your neckwear and men's furnishing sales * * *" (Plaintiff's Exhibit 8). Yet after six years of this type of advertising Color Guide meant nothing definite to any of the retail sales personnel surveyed. The evidence showed that at the most the request for a Color Guide Tie suggested to the sales people that the shoppers wanted some advice as to proper color harmony. Two clerks thought that the shopper was referring to a fashion chart, a cardboard ticket inserted in the pocket of a suit indicating an appropriate color choice of tie, shirt, socks, handkerchief, shoes and hat to wear with the suit bearing the fashion chart. Two clerks responded by showing the shopper ties with a fabric color advice label, in one instance the manufacturer being Diplomat and in the other instance, Schreter. The sales personnel were not trying to palm off another's product as plaintiff's goods. Plaintiff advised the court that it had attempted, although due to misinformation unsuccessfully at least in Maryland, to shop stores where both plaintiff's and defendant's ties were sold. Where plaintiff was successful in selecting stores carrying both plaintiff's and defendant's ties the sales people had no reason or motive for offering the shopper ties other than plaintiff's ties if "Color Guide" had indicated source origin to the clerks. Where only Wembley ties were available the sales people in offering to the shoppers plaintiff's ties were not doing so in a meaningful response to a request for a "Color Guide" tie.

The survey testimony conclusively shows that plaintiff's mark is descriptive, that it is not distinctive or capable of designating origin and that, after years of use of the alleged mark and after years of intensive advertising in consumer and trade magazines and on television, "Color Guide" has not even acquired a secondary meaning. There can be no likelihood of confusion as to the source of goods when the designation purposely chosen by plaintiff is, because of its descriptive nature, incapable of designating source. The fact that one buyer out of all of those questioned apparently connected the name "Color Guide" with Wembley does not establish distinctiveness or secondary meaning. Proof of distinctiveness requires more than proof of the existence of one person or of even a relatively small number of people who associate the words "Color Guide" with Wembley. "Distinctiveness means that the *primary* meaning of the word, in this limited field, is as a designation of source rather than of a characteristic of the product. * * * To show that a common descriptive name has acquired a de facto secondary meaning, in the sense that some or even many people have come to associate it with a particular producer, is not in itself enough to show that it has become entitled to registration as a trademark." Roselux Chemical Co. v. Parsons

Ammonia Company, C.C.P.A.1962, 299 F.2d 855, 862, 863.

For all of the foregoing reasons the court holds that plaintiff's marks were not entitled to registration or, if properly registered, are not infringed by defendant's use of the phrase "Fashion Guide."

### Unfair Competition.

The question here presented is whether or not Diplomat unfairly competes with Wembley by sewing on its ties a fabric label containing advice on color combinations. The issue at first was not so narrowly framed. In its complaint plaintiff asked that defendant be enjoined from "attaching to, or associating with, neckties of its manufacture or sold by it, a label, rider or other device advising or telling the user of such necktie the most appropriate color of suit with which the necktie might be worn." The use of such a rider, hanger, label or other device was alleged to constitute "unfair competition, a misappropriation of tangible and intangible properties and values of plaintiff, * * * and a deception of retailers of neckties and of purchasers from such retailers." Shortly after the complaint was filed plaintiff filed a motion for a temporary injunction. At the hearing on this motion defendant made a strong prima facie showing, not controverted by plaintiff, that the practice of affixing hangers, riders or labels on neckwear had been common long before 1954. Accordingly, injunctive relief was denied pending a full hearing on the merits. At the time of trial counsel for plaintiff, evidently realizing the weakness of plaintiff's position so broadly stated, advised the court that plaintiff had very much restricted its concept as to its contribution in the color harmony promotion field; "that contribution was the affixation to the necktie of a *permanently attached label*" bearing color advice. (Transcript, page 176; emphasis supplied). Without amending the complaint, plaintiff orally limited the injunctive relief sought to having defendant enjoined from using fabric labels *sewn on* neckties, to the exclusion of all other means of applying the "wear with" information to neckwear. Stapling, gluing, printing, weaving or stamping the color information on the ties themselves or using paper or plastic riders or hangers temporarily affixed to the ties to carry the color information to the purchaser or to the wearer were, according to plaintiff's own theory, means freely available to all competitors.[10] The limitation of its case to a sewn fabric label bearing the "wear with" wording was attempted to be broadened somewhat in plaintiff's brief after trial to include any permanently attached fabric label, however attached, bearing the "wear with" wording.

Wembley did not conceive, nor was it the first to use, fabric labels without the "wear with" message. Labels on ties bearing the manufacturer's name, the material of which the tie is made or phrases such as "wrinkle resistant" or "wash and wear" have been in common use for countless years. The sewn fabric label carrying the color advice is admittedly unpatentable. (Transcript, page 176). Nor did Wembley conceive the "wear with" message which has been in use since the 1930's in advertising on riders, on hangers and on other similar devices. Plaintiff has not obtained a copyright on the "wear with" wording. Plaintiff does contend, however, that it was the first tie manufacturer to take the color advice information off detach-

---

10. Plaintiff's counsel stated plaintiff's theory as to what would constitute unfair competition in open court as follows:

"Defendant's counsel: It is when you do it with stitches, I understand?

"Plaintiff's counsel: That's correct.

"Defendant's counsel: Only with stitches?

"Plaintiff's counsel: That's right.

"The Court: If you glue it on or print it or staple it on—

"Defendant's counsel: Weave it in—

"Plaintiff's counsel: We want the *fabric label permanently sewed* to the necktie." (Transcript, page 181; emphasis supplied).

able devices such as riders and to place it on a fabric label permanently attached to the tie. It should be noted that the color information does not appear on a separate label but rather has merely been added to labels previously used by plaintiff bearing the name Wembley in large print and often accompanied by a drawing of a butterfly. Thus, at the most, Wembley's concept consisted of taking the "wear with" wording admittedly available to all and placing it in small print on the bottom of labels such as those already in use on plaintiff's ties.

The record is not clear as to whether or not plaintiff was in fact the first tie manufacturer to add color advice information to labels already used by it to indicate the name of the manufacturer of the tie. Defendant when opposing plaintiff's motion for a preliminary injunction, offered as exhibits labels bearing the "wear with" wording used by Schreter & Sons and Resisto Tie Company. Corsair Neckwear Company, in addition, advertised a "Color Guide label sewn on each tie." These labels were in use after 1954, the date of the first use not being established. Mr. Miller, a partner in Diplomat, in responding to the leading question "actual sewing of the labels in the ties themselves had never been done before Wembley did it so far as you know, is that correct?"—answered "That's right". The court, therefore, will assume for the purposes of decision that Wembley was the first tie manufacturer to place the "wear with" advice on a fabric label bearing its name as manufacturer.

Wembley sees its sole, but highly important, contribution in this respect as being the carrying of the benefit of color information to the ultimate consumer. Counsel for plaintiff summarized plaintiff's position in the following way. "It is one thing * * * to put 'wear with' on a paper rider because just as soon as the wearer or customer or purchaser gets that home he takes it off and throws it in the waste basket and it is of no further use to him, but our concept with respect to what we call 'the wear with concept' was the affixation to the necktie of a permanent label telling the customer what color to wear with it." (Transcript, page 176).

Assuming, however, that Wembley was the first to place "wear with" advice on a fabric label and that such a permanent appendage carried the benefit of color advice beyond the first use of the tie, Wembley has no exclusive or proprietary right in this feature unless said label has acquired a secondary meaning.

" * * * The fact that the design of an article is strikingly novel and beautiful, and the fact that its first producer has spent large sums in advertising which has made the article popular with consumers, give that first producer no rights against others who subsequently imitate it and (taking advantage of the consumer-popularity of the article, due to the first producer's advertising) sell it competitively—unless the first producer has a monopoly based upon (1) a patent on the design or (2) a so-called secondary meaning. Absent (1) and (2), the first producer has no legal complaint because the imitators have been enriched by his efforts, have enjoyed what is known as a 'free ride.' For the common law favors competition; and it is of the essence of competition that competitors copy and undersell the product of an originator. The competitors do not lose their favored common-law position merely because someone chooses to call them 'free riders.' To have protection from such competition, the originator must possess some sort of monopoly." (Chas. D. Briddell, Inc. v. Alglobe Trading Corp., 2 Cir., 1952, 194 F.2d 416, 418).

" 'Secondary meaning' is *association*, nothing more. It exists only in the minds of those who identify some

article of commerce * * * by some name or sign and associate the two in their minds." (Nims, Unfair Competition and Trade-marks, 4th Edition, Vol. 1, section 37, page 154; emphasis supplied). All that has been said previously in regard to the survey testimony evidencing that "Color Guide" had acquired no secondary meaning after years of intensive advertising applies with equal force to permanently attached fabric labels. Not one sales person associated a permanently attached fabric label bearing the "wear with" wording with Wembley's ties. Plaintiff's evidence failed completely to show that any secondary meaning existed in the retail market. No evidence whatsoever was offered to prove that a secondary meaning existed in the minds of the purchasing public. Plaintiff merely points to the large sums allegedly spent by it in advertising its "wear with" concept [11] but "[l]arge expenditures for advertising do not compel a conclusion that the task [of proving secondary meaning] has been accomplished." (General Time Instrument Corp v. United States Time Corp., 2 Cir., 1948, 165 F.2d 853, 855, cert. den. 1948, 334 U.S. 846, 68 S.Ct. 1515, 92 L.Ed. 1770). "The critical question of fact at the outset always is whether the public is moved in any degree to buy the article because of its source and what are the features by which it distinguishes that source." (Chas. D. Briddell, Inc. v. Alglobe Trading Corp., 2 Cir., 1952, 194 F.2d 416, 419). It is highly important at this point to note that Wembley's "great step forward" [12] was the providing of continuing color advice to the *user* of the tie. The history and benefits of the "wear with" campaign both to Wembley and to the ultimate consumer were summarized by Mr. Hanson, Wembley's Vice President and Secretary, as follows:

"We found that we were getting the store to really have a fine promotional angle in selling the ties with the rider on it, but it did not sell or carry very well with the *consumer*. Once they took the hanger off of the tie and threw it away they had no further reference as to what tie the suit should be worn with. So in 1954—which we will show our first ads on that we finally came to the present market concept of the color guide having the rider on the tie calling attention to the color guide and then the fabric label sewn on the tie indicating the color of the suit to [sic] which the tie should be worn. This carried the benefit back to the *consumer*, as a permanent benefit which enabled this *man*, regardless of *his* fashion consciousness or not, to be able to match *his* suit or ties according to the labels on the tie each time *he* put that particular tie on until *he* wore it out, so it gave a permanent benefit and we were the first to put these permanent labels on the ties, the permanent sewn labels on the tie, indicating the suit with which the tie should be worn with in order to give the *consumer* this permanent benefit." (Transcript, page 256; emphasis supplied).

The consumers or wearers of neckties are usually males. Plaintiff introduced evidence to show that about eighty per cent of all men's neckties are sold to women purchasers. In view of the fact that "wear with" concept was directed to the male consumer rather than to the female purchaser, that much of plaintiff's extensive advertising was done in

---

11. That Wembley relied solely upon its heavy advertising to establish secondary meaning is evidenced by the following colloquy between counsel:

"Defendant's counsel: Under what law do you have an exclusive right to that [a permanent label bearing the 'wear with' wording]?

"Plaintiff's counsel: Secondary meaning. We believe, Your Honor, that by the origination of this concept, by the complete, final, what you might call saturation, advertising, we achieve a property right in it * * *." (Transcript, page 176).

12. Plaintiff's brief after trial, page 24.

magazines such as Esquire, Playboy, Sports Illustrated and Yale Record and that the label is attached to the necktie in such a manner that it cannot be seen by the purchaser without taking the tie in hand and examining it closely, it is not surprising that plaintiff failed to prove that the fabric labels had acquired a secondary meaning.

 Likewise plaintiff's claim that the fabric labels provide continuing advice to the user or wearer is, as previously stated in this opinion under the discussion of trademark infringement, an admission that the label is a functional and utilitarian feature of the necktie. As such it may be imitated or appropriated.

"Such a practice [of appropriating the unpatented improvements of competitors] is one of the privileges of our system of competitive enterprise. It insures to the public the benefit of all natural, useful progress in the industrial and commercial arts. Any article, structure or design, which is unpatented, may accordingly be imitated or appropriated in its *functional* aspects, if no unfair competition is involved in the manner of its use. * * *" (J. C. Penney Co. v. H. D. Lee Mercantile Co., 8 Cir., 1941, 120 F.2d 949, 953–954; emphasis supplied).

Even were the fabric label held to be a non-functional feature one may copy such a feature unless it has acquired a secondary meaning (Crescent Tool Company v. Kilborn and Bishop Company, 2 Cir., 1917, 247 F. 299). If a functional feature has acquired a secondary meaning indicating the source of the goods, the imitation is privileged if "it is accompanied by reasonable effort to avoid deceiving prospective purchasers as to the source. This may frequently be done by prominent disclosure of the true source." (A.L.I. Restatement, Torts, section 741, Comment j. 1938). Ac-

cordingly, even if the permanent fabric label bearing the "wear with" wording had acquired a secondary meaning the prominent disclosure by Diplomat of the true source would relieve it of the charge of having competed unfairly.

In J. C. Penney Company v. H. D. Lee Mercantile Co., 8 Cir., 1941, 120 F.2d 949, plaintiff sought an injunction on grounds of unfair competition due to defendant's production of an alleged imitation of plaintiff's bib-pocket on overalls. Defendant had ceased manufacturing square bib-pockets to adopt a rounded corner bib-pocket similar to plaintiff's. Plaintiff had applied for and failed to gain a patent for a rounded corner bib-pocket but in six years prior to defendant's transition to rounded corners had expended $800,000 in advertising overalls. The plaintiff's evidence established a consumer desire to have round pockets, presumably because they accumulated less dirt. The Eighth Circuit reversed a decree enjoining defendant's use of a round bib-pocket, stating: [13]

"Doubtless the advertising expenditures of plaintiff * * * were a material factor in acquainting the public with the pocket design and in opening the market for it. But these expenditures could not purchase for plaintiff the equivalent of a patent monopoly, nor operate to deprive the public of the right to competitive production in a field of functional values." (120 F.2d 949, 955).

The court declined to accept plaintiff's contention that, even if the defendant had a right to imitate the pocket design, it was palming off its overalls as those of plaintiff. Defendant was held to have clearly labeled its goods by sewing on to the bib-pocket a 1 x 1½ inch label containing its name.

"Full, fair labeling will generally speaking be held to satisfy the duty of identification in the broad field

---

13. The court ordered defendant to advise future customers that it did not make

plaintiff's overalls when the customer asked directly for plaintiff's product.

of competitive functional features. Where, however, such features have acquired a special significance as an indication of the source of the goods * * * *and* it appears that other reasonable steps can *practically* be taken to *distinguish* the goods in a particular case, the court obviously may require that this be done. If nothing except a prominent disclosure of the source of the goods by label suggests itself as a reasonable and practical step in a particular case, this necessarily must be held to be sufficient to permit the use of the functional features, despite their special significance." (120 F.2d 949, 956; emphasis supplied).

The Supreme Court was called upon in Kellogg Co. v. Nat. Biscuit Co., 1938, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73, to decide if defendant fairly exercised its right to use the name "Shredded Wheat" and the pillow shaped biscuit. Defendant's cartons were dissimilar in regard to size, form and color; the difference in labels was termed "striking." The court reversed a decree against defendant, saying:

"But the name [of defendant] was so prominent on all the defendant's cartons as to minimize the possibility of confusion. * * * The obligation resting upon [defendant] is not to insure that every purchaser will know it to be the maker but to use every reasonable means to prevent confusion. * * *

"[Defendant] is undoubtedly sharing in the goodwill of the article known as 'Shredded Wheat'; and thus is sharing in a market which was created by the skill and judgment of plaintiff's predecessor and has been widely extended by vast expenditures in advertising persistently made. But that it not unfair. Sharing in the goodwill of an article unprotected by patent or trade-mark is the exercise of a right possessed by all—and in the free exercise of which the consuming public is deeply interested." (305

U.S. 111, 121–122, 59 S.Ct. 109, 114–115).

Accordingly, even had plaintiff's permanent fabric label, a functional feature of the ties to which it was attached, acquired a secondary meaning, defendant's prominent and clear labeling would avoid any confusion as to source. As no secondary meaning has been shown to have been established either in the retail market or in the ultimate purchaser's market plaintiff has not borne its burden of proof as to the issues of unfair competition.

The clerk is directed to enter judgment for the defendant.

The foregoing opinion embodies the court's findings of facts and conclusions of law, Rule 52(a), F.R.C.P. 28 U.S.C.A.