48 CCPA

**Application of DEISTER CONCENTRA-TOR COMPANY, Inc.**

**Patent Appeal No. 6608.**

United States Court of Customs
and Patent Appeals.

Feb. 21, 1961.

Rehearing Denied June 2, 1961.

and Judge WILLIAM H. KIRKPAT-RICK.[*]

John H. Sutherland, St. Louis, Mo., (Philip B. Polster, St. Louis, Mo., of counsel), for appellant.

Clarence W. Moore, Washington, D. C., for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Judges,

RICH, Judge.

This is an ex parte appeal from the refusal to register on the Principal Register, under section 2(f) of the Trademark Act of 1946, 15 U.S.C.A. § 1052(f), as a trademark for "ore concentrating and coal cleaning tables," the following alleged trademark:

Use of the above since 1906 is asserted and the application, Ser. No. 31,474 filed June 6, 1957, contains the following description:

"The trademark consists of a substantially rhomboidal outline, and is applied to the goods by configurating the working surface thereof so that the exterior outline of such surface is substantially rhomboidal in plan; and five photographs showing the mark as actually used are presented herewith."

The photograph, or specimen, shows in plan view the top surface or deck of a concentrating or cleaning table, otherwise known in this art as a shaking table. Except for trifling variations which we ignore, the "exterior outline" of the table shown in the photograph corresponds to what is sought to be registered as a trademark.

To be somewhat more specific about what the alleged mark is, it might be well to describe in more detail the device itself. A shaking table is a device for

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of* *Judge O'CONNELL*, pursuant to provisions of Section 294(d), Title 28 United States Code.

separating solid particles suspended in a flowing film of water on the basis of differences in their size, specific gravity, or shape. The table proper or deck is a plane surface, the size of which is of the order of six by fifteen feet, which is inclined slightly from the horizontal and shaken with a differential movement in the general direction of its long axis and washed at right angles to the direction of motion by a stream of water carrying the particulate material to be separated, thus effecting the desired concentrating or cleaning action. Part of the surface of the table may be covered with "riffles" or ridges for trapping particles and moving them in a desired direction. Separation is effected by virtue of the fact that one class of particles will run off the end of the table and another class will run off the side.

According to the affidavit of appellant's president, its competitors all make their tables with rectangular or very nearly rectangular decks whereas appellant's decks have the outline shape above shown and sought to be registered as a trademark. Appellant claims to have been using this "distinctive outline shape" for more than fifty years and in 1920 Reg. No. 130,483, still in force, was obtained of a mark consisting of a design including the words "Deister Overstrom Diagonal Deck." More recent advertisements of record indicate substitution of the name "SuperDuty Diagonal-Deck" table as the name of the product. One advertisement run in February 1940 includes the statement, "The SuperDuty No. 6 Deister-Overstrom Ore Concentrating Table, utilizing our *exclusive* and *efficient* Diagonal-Deck Design, is a complete new machine offered as the highest class job available today." The alleged mark, then, is the outline shape of the deck portion of a Deister-Overstrom table.

### Rejection

The examiner's initial rejection was on the ground that "it does not appear to be capable of distinguishing applicant's goods from those of others." Applicant then replied with thirty affidavits and other evidence occupying seventy-one pages of the record here intended to show that those in the trade do in fact recognize shaking tables having tops with the above enterior outline shape as applicant's goods and do so by virtue of that shape. We have no reason to doubt that they do. However, the examiner again rejected, saying:

"It is apparent that the shape of applicant's deck tables [table decks?] is utilitarian and must be characterized as functional. It appears that applicant selected the rhomboidal shape or design to increase production and efficiency of its coal cleaning tables. It is believed that the rhomboidal outline design which applicant is seeking to register serves only to illustrate the shape of its table decks. In the case of Ex parte Alan Wood Steel Company, 101 U.S. P.Q. 209, the Examiner in Chief held that 'The fact that the design is recognizable is not sufficient to make it registrable, for if this were the criterion then every article made by one manufacturer in a form somewhat different from articles of like kind made by others would be registrable as an alleged mark.' "

On appeal, the rejection was affirmed, the board saying:

"There can be no question on the record presented but that the diagonal or rhomboidal design of the deck component of applicant's product is functional. As such, it is not a trademark. See: In re Bourns, 117 USPQ 38 (CCPA, 1958); Alan Wood Steel Company v. Watson, Comr.Pats., [150 F.Supp. 861] 113 USPQ 311 (DCDC, 1957).

"Furthermore, since applicant's ore concentrating and coal washing machinery is made in accordance with an expired and a presently subsisting patent, others in the field have, or will have, upon expiration of the latter patent, the right to make similar machinery utilizing rhomboidal shaped decks."

The board had reference, in the last paragraph, to patents No. 2,582,302 and No.

2,242,562 which appellant introduced into the record in its brief before the board.

## The Law

We shall first deal with the two cases relied on by the board. In re Bourns, 252 F.2d 582, 45 CCPA 821, we held that the appearance of a small potentiometer was unregistrable on the Supplemental Register because it was *not capable* of distinguishing the applicant's goods from those of others, within the meaning of Section 23, Trademark Act of 1946, 15 U.S.C.A. § 1091. As can be seen from our opinion, especially when considered with another one handed down the same day in a design patent case of the same applicant on the same subject matter, In re Bourns, 252 F.2d 579, 45 CCPA 817, the features and proportions of appellant's device were found to result from considerations of utility rather than appearance. The screw head in one end, the eyelets in the side, and the location of the eyelets at the corners of the channel member were all found to be utilitarian, and the appearance as a whole was made up of these features. There was no showing that appearance as a whole or any element of it was intended to indicate source or was capable of doing so.

In Alan Wood Steel Co. v. Watson, D.C. D.C., 150 F.Supp. 861, and Ex parte Alan Wood Steel Co., 101 USPQ 209 (P. O. Examiner in Chief), which seem to us indistinguishable in principle from the present case, the alleged mark sought to be registered was a raised non-skid pattern integrally produced on steel plate flooring. An illustration of it will be found in the opinion of Examiner-in-Chief Federico in 101 USPQ at p. 210. As his opinion also shows, some seventy affidavits were filed to establish that the design did in fact enable the affiants to recognize the plates as the product of the applicant. He concluded, nevertheless, that, in itself, that fact would not justify registration.[1] The case was taken to the District Court for the District of Columbia under 35 U.S.C. § 145 where

Judge Holtzoff sustained the refusal to register because the configuration of goods sought to be registered was "utilitarian" or "functional," citing The J. R. Clark Co. v. Murray Metal Products Co., 5 Cir., 219 F.2d 313. Judge Holtzoff said:

"Were the law otherwise, it would be possible for a manufacturer or dealer, who is unable to secure a patent on his product or on his design, to obtain a monopoly on an unpatentable device by registering it as a trademark. The potential consequences to the public might be very serious, because while a patent is issued for only a limited term, a trademark becomes the permanent property of its owner and secures for him a monopoly in perpetuity." 150 F.Supp. at page 862.

We agree with the philosophy underlying that statement. To give appellant the trademark registration it asks for here would give it a potential perpetual monopoly on the outline shape of its shaking table deck. The basic issue here is whether the law permits such a monopoly.

In the Clark case, supra, the article was an ironing board or table with a perforated top made of expanded metal. The suit was one for patent infringement and unfair competition and on the latter issue it was contended that the distinctive appearance of the ironing board had acquired a secondary meaning justifying injunctive relief. The Court of Appeals for the Fifth Circuit gave as one of its reasons for refusing relief, asked for on the basis of "secondary meaning" (which is but another way of saying that the appearance of the ironing board had become capable of indicating the source of the goods), that

" * * * the novel appearance of the flat expanded metal top of appellant's ironing table, being functional and a result of a well known manufacturing process, may not acquire any secondary meaning which

1. What Mr. Federico actually said on this point is contained in the portion of the examiner's letter we have quoted above.

would render it subject to exclusive appropriation by anyone in the trade." 219 F.2d at page 320.

Judge Holtzoff, in the Alan Wood Steel case, restated the proposition thus:

"A novel shape or appearance that is functional in character may not acquire any secondary meaning that would render it subject to exclusive appropriation *as a trademark.*" 150 F.Supp. at page 862. [Emphasis ours.]

We agree with that statement but we observe that it does not tell us how to determine when a novel shape or appearance is "functional" or whether *any* shape that performs a utilitarian function falls in that category. Appellant argues that a mark whose primary significance is to indicate origin may be registered notwithstanding "a modicum of inherent functionality" and "that outline shape is not required to be wholly useless to qualify for registration." We also agree in general with those statements. What, then, is decisive of non-registrability in a situation like this?

A functional feature has been defined in the Restatement of the Law of Torts, Section 742, as a feature of goods which affects their purpose, action, or performance, or the facility or economy of processing, handling or using them. The courts have accepted this definition and have also held "functional" the shape, size, or form of an article which contributes to its utility, durability or effectiveness or the ease with which it serves its function. James Heddon's Sons v. Millsite Steel & Wire Works, Inc., 6 Cir., 128 F.2d 6; J. C. Penney Co. v. H. D. Lee Mercantile Co., 8 Cir., 120 F.2d 949; West Point Mfg. Co. v. Detroit Stamping Co., 6 Cir., 222 F.2d 581.

In the J. C. Penney case, speaking of the practice in the overall industry of copying competitors' improvements, the court said:

"Such a practice is one of the privileges of our system of competitive

enterprise. It insures to the public the benefit of all natural, useful progress in the industrial and commercial arts. Any article, structure or design, which is unpatented, may accordingly be imitated or appropriated in its functional aspects, if no unfair competition is involved in the manner of its use." 120 F.2d at page 953.

We would add only that copyright, as well as patenting, may temporarily prevent copying.[2] Like statements by the courts, that right to copy in the absence of such statutory protection is a fundamental aspect of our law, have been made on numerous occasions and an extensive consideration of the subject and review of authorities will be found in the West Point case, supra. In that case the court said:

"The identical imitation of the goods of another does not in itself constitute unfair competition.

\* \* \* \* \* \*

"There is nothing unlawful in copying the unpatented products of another *down to* the last detail, except in so far as the resulting similarity may become a means of securing his customers through their belief, so induced, that your goods are his." 222 F.2d at page 589.

As to functional features which have acquired what is usually termed a "secondary meaning," the court quoted from the Restatement of the Law of Torts as follows:

"If an imitated feature is functional but has also acquired generally in the market a special significance as an indication of the source of the goods, the imitation is privileged if it is accompanied by reasonable effort to avoid deceiving prospective purchasers as to the source. This may frequently be

---

2. At the present time and especially since Mazer v. Stein, 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630, there is a certain amount of overlap in the protection available through design patents and that available by copyright, insofar as a design may qualify as a "work of art" under 17 U.S.C. § 5.

done by prominent disclosure of the true source." 222 F.2d at page 590.

See Sylvania Electric Products, Inc. v. Dura Electric Lamp Co., 3 Cir., 247 F.2d 730, affirming D.C.N.J., 144 F.Supp. 112.

 It is basic to our consideration, therefore, that the socio-economic policy supported by the general law is the encouragement of competition by all fair means, and that encompasses the right to copy, very broadly interpreted, except where copying is lawfully prevented by a copyright or patent. And since under the principle laid down in Article I, section 8, of the Constitution copyright or patent protection is necessarily limited in time, we are not seriously concerned with whether he who claims trademark rights of *unlimited* duration now has or did have patent protection,[3] or what that protection is or was. We, therefore, see no reason to consider appellant's patents except to the extent they may contain evidence of the functionality of the outline shape sought to be registered as a trademark.[4]

In contemplating the registration of a mark on the Principal Register we must bear in mind the significance of such registration. Under section 7(b) of the Lanham Act (15 U.S.C. § 1057(b), 15 U.S.C.A. § 1057(b) it constitutes "prima facie evidence of the validity of the registration, registrant's *ownership of the mark,* and of *registrant's exclusive right to use the mark* in commerce in connection with the goods or services specified in the certificate" (our emphasis). This means, so far as this case is concerned, that we cannot sanction registration on the Principal Register of anything unless the applicant for registration, absent a copyright or patent, would have the right under the general law to prevent others from using or copying it. Unless he has such right, he does not own a trademark. It is trite to say that the Lanham Act does not create trademarks. While it may create some new substantive rights *in* trademarks, unless the trademarks pre-exist there is nothing to be registered. Neither does it create ownership, but only evidence thereof. Under section 1, only "The owner of a trade-mark" can apply for registration. Since the act nowhere defines ownership of a trademark (see 68 Harv.L.Rev. 814, Trade-Marks and Unfair Competition, at p. 876), the law of trademark ownership must be found outside the statute, in the absence of some specific provision to the contrary. We know of none and appellant tells us that nowhere in the statute is a "functional" mark mentioned pro or con.

What must be determined, therefore, is whether appellant has the "exclusive right to use" the outline shape sought to be registered, in other words, whether appellant has, *apart from* possible temporary monopoly rights based on patent or copyright, *the right to exclude others from using that* shape in shaking table decks.[5]

3. It is our view that the only significance of the existence of an expired patent on the article copied is that it adds another reason for saying that the public has the right to copy it, it being basic to the patent system that the public may copy when the term of a patent comes to an end, with certain exceptions. However, the right to copy is not derived in any way from the patent law; it is a right which inheres in the public under the general law except to the extent the patent law may remove it. The same is true of copyrights. When a temporary incursion on the public right ends, the public right remains. No new right is born.

· 4. This case is the reverse of the more common situation in that the patents were not cited by the Patent Office to show what the public would have a right to use when they expired, but were put in evidence by appellant to provide grounds for an argument that the structures shown in the patents did *not* have the outline shape it desires to register. As might be expected under these circumstances, the patents are only mediocre support for the Patent Office position.

5. At oral argument the Patent Office Solicitor, as he often has in other cases, said that the alleged mark was not registrable because it is "not a trademark." That is stating the same proposition in a shorthand form. To say one has a "trademark" implies ownership and ownership implies the right to exclude oth-

On what basis does appellant claim to have the exclusive right to use its table deck outline? Specifically, its brief never comes to grips with this basic issue, perhaps because the Patent Office never raised the issue in that form but only in terms of "functionality." To that rejection appellant's reply, supported by the affidavit evidence, was twofold: (a) that its alleged mark had "become distinctive of the applicant's goods in commerce," the language of 2(f) (15 U.S.C. § 1052 (f), 15 U.S.C.A. § 1052(f); and (b) that it had acquired a "secondary meaning."

These arguments are based on words and phrases rather than on matters of substance. We shall take them up in order and explain what we mean. Much confusion can be produced from statements made in the opinions which collectively constitute the case law in this field. It may be helpful, therefore, to begin by stating some applicable truisms:

(1) Trademarks enable one to determine the existence of common source; but not everything that enables one to determine source is a trademark.

(2) A trademark distinguishes one man's goods from the goods of others; but not everything that enables goods to be so distinguished will be protected as a trademark.

(3) Some trademarks are words or configurations which are protected because they have acquired a "secondary meaning"; but not every word or configuration that has a de facto "secondary meaning" is protected as a trademark.

(4) A feature dictated solely by "functional" (utilitarian) considerations may not be protected as a trademark; but mere possession of a function (utility) is not sufficient reason to deny protection.

[5] As to appellant's argument based on the allegation that its outline shape has become "distinctive" of its goods, the assumption seems to be that if that is so then section 2(f) requires that the

Patent Office grant the registration. At least appellant says, "It would vitiate the purpose of Section 2(f) to refuse registration." Mere reading of 2(f) answers this. There is nothing whatever in the section saying what *shall* be registered. It is purely negative, saying that if a mark has become distinctive, nothing "herein" shall *prevent* registration. It then says the Commissioner *may* accept five years substantially exclusive and continuous use as a mark as prima facie proof of distinctiveness and that is all. The Commissioner is neither bound to accept it nor limited by the section as to what he may accept as proof of "distinctiveness." This leaves the question of *trademark ownership*, which is a prerequisite to registrability, to be determined by other law than section 2(f). At this point we refer back to truism (2). The case law amply supports it. We have referred above to some of the cases to which we would now add reference to the "Shredded Wheat" case, Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73, wherein the Supreme Court, in denying protection against copying the pillow-shaped form of the product, said:

"Sharing in the good will of an article unprotected by patent or trade mark is the exercise of a right possessed by all—and in the free exercise of which the consuming public is deeply interested." 59 S.Ct. at page 115.

In that case the court said it was "without legal significance" that there had been a long delay between the coming into being of Kellogg's freedom to make shredded wheat biscuit upon expiration of patents and the exercise of that right, during which period the plaintiff had spent $17,000,000 in advertising *which identified the product as its manufacture.* The court also said:

"Kellogg Company's right was not one dependent upon diligent exer-

---

'ers. If the law will not protect one's claim of right to exclude others from using an alleged trademark, then he does

not own a "trademark," for that which all are free to use cannot be a trademark.

cise. Like every other member of the public, it was, and remained, free to make shredded wheat when it chose to do so; and to call the product by its generic name.

\* \* · \* \* \* \*

" \* \* \* the name and form are integral parts of the goodwill of the article. To share fully in the goodwill, it must use the name and the pillow-shape. And in the goodwill Kellogg Company is as free to share as the plaintiff." 59 S.Ct. at page 114.

Section 2(f) of the Lanham Act must be so construed as to take the foregoing basic principles into account.

Some cases in which this court has denied registration to functional shapes or features on the basis of the foregoing principles are: In re Vertex Hosiery Mills, Inc., 45 F.2d 249, 18 CCPA 725; In re National Stone-Tile Corporation, 57 F.2d 382, 19 CCPA 1101, and Sparklets Corporation v. Walter Kidde Sales Company, 104 F.2d 396, 26 CCPA 1342.

The fundamental distinction appellant overlooks is that between "functional" shapes that are never capable of being monopolized, even when they become "distinctive of the applicant's goods," and shapes which can be monopolized because they are of such an arbitrary nature that the law does not recognize a right in the public to copy them, even if some incidental function is associated with them. Consider, for example, that the stitching in the Simmons case, cited infra, is functional as stitching. The Lanham Act, as appellant says, does not deal with this distinction.

The "secondary meaning" aspect of the argument is the practical equivalent of the "distinctive" argument except that reliance is placed on a different expression. We refer back to truism (3). The distinction we should like to make here is between a de facto "secondary meaning" and one to which courts will attach legal consequences. While there are many statements in the cases which seem to say that if a mark has acquired a "secondary meaning" its owner will be protected in an exclusive right to use it, the clear weight of authority shows that the courts will not support exclusive rights in any word or shape which, in their opinion, the public has the right to use in the absence of patent or copyright protection. In the Alan Wood Steel and J. R. Clark Co. cases, supra, it was said that the shapes "may not acquire any secondary meaning." [150 F.Supp. 862.] This was simply a refusal to give any legal significance to the existence of a de facto "secondary meaning" in shape indicative of source. In Upjohn Co. v. Schwartz, 2 Cir., 246 F.2d 254, the court simply stated that the size, shape, and color of medicinal capsules were "functional" features which "could not" acquire any secondary meaning. In the Kellogg case the Supreme Court said there is "no basis here for applying the doctrine of secondary meaning." In the same paragraph it said, speaking of the name "shredded wheat" which was claimed to have acquired a secondary meaning:

"The evidence shows only that due to the long period in which the plaintiff or its predecessor was the only manufacturer of the product, many people have come to associate the product, and as a consequence the name by which the product is generally known, with the plaintiff's factory at Niagara Falls." 59 S.Ct. at page 113.

Thus "Shredded Wheat" had a de facto "secondary meaning" as an indication of source, but the court refused to attach any legal consequence to that "secondary meaning." As to the shape of the shredded wheat biscuit the court ruled:

"Where an article may be manufactured by all, a particular manufacturer can no more assert exclusive rights in a form in which the public has become accustomed to see the article and which, in the minds of the public, is primarily associated with the article rather than a particular producer, than it can in the case of a name with similar con-

nections in the public mind. Kellogg Company was free to use the pillow-shaped form, subject only to the obligation to identify its product lest it be mistaken for that of the plaintiff." 59 S.Ct. at page 114.

Again what appellant fails to take into account is that as to some words and shapes the courts will never apply the "secondary meaning" doctrine so as to create monopoly rights. The true basis of such holdings is not that they cannot or do not indicate source to the purchasing public but that there is an overriding public policy of preventing their monopolization, of preserving the public right to copy. A certain amount of purchaser confusion may even be tolerated in order to give the public the advantages of free competition. To quote again from the Harvard Law Review, op. cit. p. 816:

"The extent to which the owner of * * * a mark is given exclusive rights in it is determined by a tension between the desire to secure to producers the benefits of their labors by preventing consumer deception as to the source of goods, and the desire to keep free the means of expression necessary for effective competition. The public interest in preventing consumer deception or injury has rarely been thought of as the primary rationale behind trademark protection; * * *."

In final analysis it would seem to be self-evident that government economic policy as reflected in law must be determined by the legislature and the judiciary and cannot be left to depend wholly on the attitudes, reactions or beliefs of the purchasing public. Public acceptance of a functional feature as an indication of source is, therefore, not determinative of right to register. Preservation of freedom to copy "functional" features is the determining factor.

Is the Alleged Mark a Functional Shape?

On this decisive factual question the board relied on the two patents and some of the advertisements appellant put in the record, quoting therefrom the following items (all emphasis ours):

"(1) The deck, and hence the treating surface, is herein shown, for purposes of illustration, as diagonal or rhomboidal in outline, *which is of specific advantage * * *.* The rhomboidal deck conforms closely to the oblique spread of the material and hence *provides a highly efficient treating surface.*

"(2) The rhomboidal shape of the deck *permits the use of an unusually large number of efficient rifles.*

"(3) * * * utilizing our exclusive and *efficient* Diagonal-Deck design."

While appellant criticizes a passage quoted by the board from some source dehors the record, it admits in its brief to having published the following very similar statement:

"(4) The Super-Duty Table—Offers *Higher Capacity—Small middling loads,* a direct result of the Diagonal-Deck design * * *."

On the basis of such statements the board said there was no question about the rhomboidal outline shape being functional.

Appellant makes a variety of attacks on this finding of fact which we need not analyze. It does not flatly deny the existence of some functionality but attempts to reduce it to a *de minimis* status. The arguments do not impress us and we do not agree that the functionality of the rhomboidal shape is either *de minimis* or secondary. It is clearly primarily and essentially dictated by functional or utilitarian considerations. We would be satisfied to so hold on the basis of the disclosures in the record, which contains no indication whatever that the shape was either arbitrary or intended, when adopted, to indicate origin. However, as a precautionary check, we have referred to two standard texts well known in the field of mineral dressing, of which we take judicial notice. In Taggart's Handbook of Mineral

Dressing, 1945, Sec. 11, page 74, we find the following:

"19. Deister-Overstrom Diagonal-Deck Tables

"*Description.* Decks of these tables are rhombohedral, with rectilinear motion in the direction of the short diagonal, which is also the tilting axis and the direction of all riffling.

\* \* \* \* \*

"The asserted *advantage* of the rhombohedral as compared with a substantially rectangular shape is argued on the basis of Fig. 58. When treating a sized or classified feed on a rectangular deck, the area of table actually occupied by ore takes the form of a diagonal band from feed to concentrate corners \* \* \* [there follows detailed description with reference to letters on the diagram which depicts a deck indistinguishable in outline shape from the application drawing] \* \* \* The rhombohedral deck \* \* \* makes the additional riffled area BFJ available. All other things being equal, this added riffled area in the slime path will settle some material that would have been discharged by a rectangular table \* \* \*. The rhombohedral deck should, therefore, treat a larger tonnage of a classified feed or handle a longer-range feed than a rectangular table with equal tailing loss.

\* \* \* \* \* \*

"The argument is plausible. Certainly the opportunity for catching and bringing material to the cleaning plane is greater on the diagonal deck, and there is also a proportionately longer line of riffling on the line of cross-water flow below the emergence of any given riffle at the cleaning plane on the rhombohedral than on the diagonal [sic] deck. Hence there is more chance to catch heavy mineral scoured off the cleaning plane and represent it."

We think it is particularly significant that this item in Taggart's Handbook contains an illustration (Fig. 59(b)) corresponding exactly to the specimen photograph filed in the application at bar. It also gives us the deck dimensions which, referring to the application drawing, supra, starting with the right hand short side and proceeding clockwise, are: 6'6"-14'2"-6'3"-14'11". That is the table to which the above quoted text had reference. We are unable to reconcile this technical data, long available to the appellant's trade, "who are people with engineering and mechanical savvy," according to appellant's brief, with the statement in that brief that "no substantial functional advantage inheres in the mere outline shape sought to be registered."

Gaudin, Principles of Mineral Dressing, 1939, page 313, says:

"The Deister and Deister-Overstrom tables utilize a different head motion and are roughly rhombohedral in shape. The rhombohedral shape results in some saving in floor space."

It seems to us that this case perfectly exemplifies what we mean by a functional or utilitarian shape which is incapable of acquiring a legally recognizable "secondary meaning" or of becoming an enforceable trademark for the simple reason that, absent patent protection, the public has the right to copy the shape and enjoy its advantages. Under no circumstances can it be accorded the legal protection to which trademarks are entitled. This being so, there is no need to consider the extensive efforts made by the use of what appellant calls advertising "gimmicks" featuring "rhomboidal" shapes or otherwise, to turn this outline shape of the goods, per se, into a registrable mark. It has attempted the impossible. In the words of the J. C. Penney case, supra:

"Doubtless the advertising expenditures of the plaintiff, during the period that it was able to pre-empt and hold the field \* \* \* were a material factor in acquainting the public with the \* \* \* design and in opening the market

for it. But these expenditures could not purchase for plaintiff the equivalent of a patent monopoly, nor operate to deprive the public of the right to competitive production in a field of functional values." 120 F.2d at page 955.

 It should be clear from what we have said that we are not denying registration merely because the shape possesses utility but because the shape is *in essence* utilitarian. Where a shape or feature of construction is in its concept arbitrary, it may be or become a legally recognizable trademark because there is no public interest to be protected. In such a case protection would not be lost merely because the shape or feature also serves a useful purpose. See In re Simmons Company, 278 F.2d 517, 47 CC PA 965. The Deister table deck, however, is shaped as it is only for reasons of engineering efficiency.

The decision of the board is affirmed.

Affirmed.