**REDKEN LABORATORIES, INC.,**
Plaintiff,

v.

**CLAIROL INCORPORATED,**
Defendant.

No. 70–2770–MML.

United States District Court,
C. D. California.

June 15, 1972.

8. Vogel v. Jones, Patent Office Interference, *supra*, paper no. 75.

Christie, Parker & Hale, Andrew J. Belansky, Edwin L. Hartz, Pasadena, Cal., for plaintiff.

Lyon & Lyon, Reginald E. Caughey, Conrad R. Solum, Jr., Los Angeles, Cal., Weil, Lee & Bergin, Alfred T. Lee, New York City, for defendant.

### Memorandum and Order of Judgment

LUCAS, District Judge.

Plaintiff filed a complaint under 15 U.S.C. § 1071(b) for restoration of a trademark filed with the United States Patent Office. The trademark, "CURL & CONDITION," refers to a permanent wave lotion for which the Patent Office issued Registration No. 858,448 on October 8, 1968. On October 29, 1970, the Trademark Trial and Appeal Board of the Patent Office granted defendant's petition for cancellation of the trademark. 168 U.S.P.Q. 187. Plaintiff appealed the cancellation decision to the Court of Customs and Patent Appeals under 15 U.S.C. § 1070. Defendant then served notice of its election available un-

der 15 U.S.C. § 1071(b). In December 1970, plaintiff filed the complaint in this action seeking a review of the cancellation proceeding.

In its answer, defendant filed two counterclaims, the first alleging that plaintiff's use of the term "CURL & CONDITION" infringed its rights to the term "CONDITION" which described a product designed to improve the texture and appearance of hair, and the second alleging that plaintiff's use of its term infringed its rights to the term "CONDITIONOL," which described a product designed for use as a lotion and neutralizer. Defendant requested damages and injunctive relief restraining plaintiff from the use of the word "condition" or any simulation thereof. Defendant's second counterclaim was dismissed with prejudice on July 16, 1971.

In its decision, the Board extensively covered the background of the two marks with respect to their initial conception and usage in the trade, their relative promotional expenditures through the various advertising media, and their respective sales in beauty salon and retail channels. This Court will not elaborate upon facts bearing upon these particular findings. Rather, the emphasis will be to develop various facets of the case which have been raised in this proceeding pertaining to the usage of the term "condition," and to apply what this Court feels to be controlling principles of law which have emerged from the record before the Board supplemented by evidence acquired through discovery and testimony at trial.

The Court recognizes the Board's conclusions as to the expenditure of substantial sums of money by the defendant in promoting its mark "CONDITION" since 1960, its sales reflecting to a great extent the success of that promotion. However, evidence was presented which indicates that the term "condition," and its derivatives, has been similarly exploited by various members of the cosmetic trade in promoting their product, either as part of their mark, or as part of the descriptive phrases or slogans pertaining to the product.[1] The Court also considered testimony which indicated that the term "condition" occupies a particularly useful position in the vocabulary of the trade.[2] In fact, the term is literally indispensable for purposes of

1. The Court considered the following hair conditioning products which are distributed within the trade: "Balsam"—"Conditioning Permanent Wave," by The Wella Corporation; "Caryl Richards Salon Spray"—"Dressing & Conditioner," by Caryl Richards, Inc.; "Conditionol," by Helene Curtis Industries, Inc.; "Du Sharme"—"Conditioner/Hair Dressing," by J. Strickland & Co.; "El-nett Satin"—"Conditioning Hair Spray with Lanolin," by Cosmair, Inc.; "Instant Condition & Set," by Style Division of LaMaur, Inc.; "J/R Condition-Set Curl Lotion," "All-Protein Wave-Set," by Jheri Redding Products, Inc.; "L'Oreal Coiffal" "Conditioning Setting Lotion," by Cosmair, Inc.; "Neutrafil" "A nutritional gel filler & conditioner for hair," by Dep Corp.; "Ogilvie Conditioning Hair Spray," by Tussy Cosmetics, Inc.; "Ogilvie Conditioning Shampoo," by Tussy Cosmetics, Inc.; "Porofil Creme Conditioner," by Faberge, Inc.; "Suffrage" "Luxury Conditioning Wave" by Cosmair, Inc.; and "Tried & True" "Proteined Hair Conditioner" by Max Factor, Inc.

In examining the trade journal, "Modern Beauty Shop," which is a professional hair dresser's magazine, the Court found that the term "condition" was frequently utilized by other members of the trade before and during the period in which defendant made its substantial promotion adventure with its product. (The Board had found that defendant first exploited the term "condition" in October 1960, and that plaintiff followed in June 1967.)

2. The noun "condition" is defined in part as "a mode or state of being . . . proper or good condition . . . the state of being fit;" the verb "condition" is defined in part as "to attain proper or fit condition . . . to put into proper or the desired condition: as . . . to restore the desired amount of moisture to (as fiber)." Webster's Third New International Dictionary 473 (1971). "Fiber" is defined in part as a "natural or man-made object . . . that is obtained from animals (as wool, hair, silk, fur)." Websters, at 843.

easily describing the functions and purposes of those various products in the cosmetic industry which are generically referred to as "hair conditioners."[3]

The Court also considered evidence which distinguished the uses of the two products, which, in turn, served to define the appropriate channel of trade. Plaintiff's product, "CURL & CONDITION," consists of two bottles in a white and black box. On the front of the box is the mark. On the left side of the box is the inscription, "For Professional Use Only." The instruction booklet provided within the box states on the first page, "Sold Only to Professional Beauticians." On the last page of this four-sided two-page booklet are two delineated boxes providing "Test Curl Directions," and the inscription "Important." Within the latter delineated box are detailed instructions to the beautician the purpose of which is to prevent injury to the patron's scalp or the beautician's hands. Again, this set of instructions provides "This wave is for professional use only." Immediately thereafter, this set includes a paragraph which disclaims all warranties express or implied with respect to users not directly controlled or paid by the plaintiff.

Defendant's product, "CONDITION," consists of a white jar of about three inches in height and four inches in diameter. The gold lettering on the jar states that the product is "The Beauty Prescription for Troubled Hair," and is further described as a "Beauty Pack Treatment." On the curved surface of the jar, to the left of the above inscription, are the words, "For Professional Use Only," which is the only vertically written inscription on the jar. Consequently, the jar has to be turned ninety degrees in order for that inscription to be adequately noticed. There are no other references on the product which carries the thrust of that statement, although, in the general instructions on the back of the jar, a paragraph makes an oblique reference to the "user" giving a "patron a monthly *condition* beauty pack treatment to keep hair at its best." The other paragraphs contain general instructions to the consumer presumably for ordinary home application. The mark "CONDITION" appears in these paragraphs in lower-case boldface type. Defendant also utilizes the verb "condition" parenthetically in ordinary type in this set of instructions.[4]

The plaintiff's product is distributed directly to beauty jobbers or to the individual salons. This is intended to be the exclusive market distribution, which is consistent with the plaintiff's contention that "CURL & CONDITION" is designed for professional use only by beauticians in providing services for patrons. No evidence was presented showing actual distribution of this product to retail outlets. Some evidence was presented to the effect that it was not impossible for an ordinary consumer to acquire this product from a salon, however, this acquisition is not deemed to be tantamount to a purchase from a retail store in the ordinary course of business.[5] The prod-

---

3. The Board found that "condition" is not the generic name for the goods described as "hair conditioners." 168 U.S. P.Q. at 189. The Court does not disagree with that conclusion. However, the term "condition" is well established in the trade as the generic name for the *process* by which the hair of adult females is enhanced in structure and appearance. The question thus becomes whether defendant has the right to claim exclusive appropriation of that term for its own restricted use. *See* discussion, *infra.*

4. "2. USE *condition* WHILE LIGHTENING HAIR. (Conditions and protects.)"

5. The Court was particularly persuaded by the ordinary consumer's limited access to the plaintiff's product for retail purchase and home consumption. One of defendant's employees was instructed to approach a distributor and to attempt a purchase of "CURL & CONDITION." This purchase, although successful, was not a typical "over the counter" sale. It was not consummated at an establishment which customarily holds itself out to the public-at-large as a merchant dealing in such goods for home consumption. In fact, the distributor did not have a single package available for the em-

uct is displayed in the salon in glass cases which the patron may observe while waiting for services by the beautician. The patron also has the opportunity to read "CURL & CONDITION" advertisements in the trade magazine "Modern Beauty Shop" which may be found in the salon waiting room.[6] Evidence was presented that plaintiff has offered post cards to beauticians for distribution to patrons which display an internationally-known hair stylist promoting the plaintiff's product.[7]

No evidence was presented to support the proposition that there is a meaningful diversion of the plaintiff's product into retail channels through possible purchasing of "CURL & CONDITION"

from the salon operators or the individual beautician.[8] Furthermore, no evidence was presented from which the Court may properly infer that, whatever diversion does occur into retail channels, if any, such diversion overcomes the customary reliance of the patron upon her hairdresser to screen out those products deemed undesirable for her individual needs, or harmful to her person.[9] This professional screening of hair conditioning products is a logical inference from the record as a whole. Accordingly, although the possibility is not excluded that the ordinary patron may be deemed, under other circumstances, to be a potential purchaser within the broad meaning of the Trade-Mark Act of 1946,[10] on the basis of this record it

ployee at the counter, but was required to retrieve one from a back storage room. In addition, there is the possibility, which cannot be excluded, that the distributor presumed the employee to be a professional beautician who merely wished to examine the product. In light of plaintiff's advertisements directed to beauty jobbers this is not wholly unlikely. This latter inference is conjectural, of course, but it illustrates the shallowness of establishing defendant's proposition of retail diversion and consumption by one isolated and artificial instance.

6. See note 1, supra.

7. Vidal Sasson, an English hair stylist, sponsored plaintiff's product at its introduction.

8. See note 17, infra.

9. Arguably, the patron might read magazines such as "Modern Beauty Shop," which are primarily professional trade journals, and thus be exposed to plaintiff's advertisements. The Court is not convinced that whatever impact is made upon the patron as a result of these advertisements such is not overridden for all practical purposes by the patron's reliance upon the services of her hairdresser, who, in the final analysis, makes the selection of the appropriate product based upon her professional judgment.

10. Defendant contends that the true test for likelihood of confusion lies not with respect to the salon trade, including beauticians and jobbers, but with respect to any person who may be exposed to the mark. Syntex Laboratories, Inc. v. Norwich Pharmacal Co., 437 F.2d 566, 568

(2nd Cir., 1971), relied upon by defendant for this proposition, accurately notes that 15 U.S.C. § 1114(1)(a) originally required a showing of likelihood of confusion or deception of purchasers as to the source of goods or services, but that the 1962 amendment eliminated such language referring to purchasers as the subject of deception. This Court places a somewhat more practical and restrictive construction upon the effect of the 1962 amendment than what may be inferred from this brief reference in Syntex. In the Senate Report (No. 2107) which analyzed the proposed amendment (H.R. 4333) the deletion of the language in Section 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114(1)(a) was deemed "parallel to a similar change made in section 2(d) of the act." 2 U.S.Code Cong. & Admin.News 2851 (1962). In the legislative analysis provided for interpretation of the amendment of Section 2(d) of the Act, 15 U.S.C. § 1052(d), the Senate Report noted, "The purpose of the proposed change is to coordinate the language here with that used elsewhere and to omit the word 'purchasers,' since the provision actually relates to potential purchasers as well as to actual purchasers. The word 'purchasers' is eliminated so as to avoid the possibility of misconstruction of the present language of the statute." 2 U.S.Code Cong. & Admin.News 2847 (1962). Congress appeared only to remove the distinction between potential and actual consumers insofar as confusion in selection of goods may be likely to occur in a particular trade. It did not intend to expand the reach of that section to an abstract plane whereon judges

must be concluded that for purposes of resolving the issues presented the potential purchaser must be limited to the salon operator and the individual distributor.

The issues which developed may be summarized as follows:

(1) whether the essentially descriptive word "condition" has become so associated with defendant's product, through substantially exclusive usage of sufficient duration, that a secondary meaning has been acquired which overcomes its inherent weakness as a descriptive term within the trade;

(2) whether, given an acquisition of secondary meaning, there is a likelihood of confusion between the two products in the appropriate channel of trade; and

(3) whether, given a likelihood of confusion between the two products, the defendant is estopped from asserting a claim for equitable relief by its prior conduct.[11]

■ In reviewing a Board decision, the Court must abide by that administrative body's finding unless evidence to the contrary is presented which in "character and amount carries thorough conviction." Morgan v. Daniels, 153 U. S. 120, 125, 14 S.Ct. 772, 773, 38 L.Ed. 657 (1894); Safeway Stores v. Dunnell, 172 F.2d 649, 652 (9th Cir., 1949). Evidence considered in this review may include "further testimony" with respect to the issues of fact presented. 15 U.S. C. § 1071(b)(3). At the outset, it should be emphasized that the Board substantially relied upon an advertising campaign and sales analysis to support its conclusions with respect to the acquisition of a secondary meaning for defendant's product.[12] This decision will

are to contemplate its application to theoretical consumers in an imaginary setting. Congress merely sought to clarify the logical thrust of the Act—that when products cross in the marketplace for consideration by a consumer the likelihood of confusion is to be determined not only with respect to those who actually make a purchase, but also with respect to those who view the wares with the prospect in mind of making a purchase. The thrust is not deception as an academic consideration, but deception as an economic possibility.

11. This issue arises primarily as a result of related litigation between defendant and Helene Curtis Industries, Inc. Defendant had applied for registration of its mark which application was refused on grounds that it so resembled Helene Curtis' mark "CONDITIONOL" as to be likely to cause confusion. This refusal was upheld by the Board. 158 U.S.P.Q. 471. Plaintiff's estoppel theory is based on the conduct of defendant and Helene Curtis surrounding two agreements whereby the two parties purportedly divided the outlets for their two products into two markets, and whereby Helene Curtis subsequently assigned rights to its mark to the defendant. The merit of this contention advanced by plaintiff is not reached. See discussion, infra.

12. The Board cited Standard International Corporation v. American Sponge and

Chamois Company, Inc., 157 U.S.P.Q. 630 and La Maur, Inc. v. Revlon, Inc., 146 U.S.P.Q. 654 as authorities for its conclusions. Although this Court's decision is based on a different approach, see discussion, infra, in passing it should be noted that both of these cases seem to be distinguishable from the instant case. In Standard International, the inherently weak mark found to have acquired a secondary meaning was "DUST 'N WAX." (The opposing mark was "DUST 'N GLOW".) The former mark appears to convey far less of a descriptive import within that particular trade than "CONDITION" in the hair cosmetic industry. And, in that case, the Board applied its appropriation theory, based on "subsequent expenditures" and "resultant sales," to a mark composed of word combinations which tended to more closely approach the arbitrary end of the trademark spectrum than the descriptive end. The question there was not whether the applicant could appropriate "DUST" but whether it could appropriate "DUST 'N WAX." This Court feels that if the substantial expenditure appropriation theory is carried to its logical extreme a giant enterprise in any given trade could so saturate the media with a mark essentially descriptive of a particular function or purpose in that trade that other members of the trade would forever be deprived of utilizing that term in attempting to convey the essential char-

be predicated on other factors which bear upon the question of secondary meaning acquisition, and which appear to occupy a dispositive position in answering that initial question.

■ The Court has noted above the importance of the term "condition" in the vocabulary of the trade in describing the functioning and purpose of that line of products within which defendant is a competitor, namely hair conditioners. Thus, at the threshold, this Court is squarely confronted with a principle recently reiterated by the Ninth Circuit in Bada Company v. Montgomery Ward & Co., 426 F.2d 8 (9th Cir. 1970), *cert. denied* 400 U.S. 916, 91 S.Ct. 174, 27 L. Ed.2d 155 (1970):

> The law is that a word which is in its primary meaning merely descriptive of the goods to which it is applied may not be appropriated as the exclusive trademark of a single seller, since one competitor will not be permitted to impoverish the language of commerce by preventing his fellows from fairly describing their own goods. Lanham Act § 2(e), 15 U.S.C. § 1052(e); Delaware & H. Canal Co. v. Clark, 80 U.S. (13 Wall.) 311, 20 L.

Ed. 581 (1871); Rohr Aircraft Corp. v. Rubber Teck, Inc., 266 F.2d 613, 623 (9th Cir. 1959); Telechron, Inc. v. Telicon Corp., 198 F.2d 903 (3d Cir. (1952). 426 F.2d at 11. *See* Meehanite Metal Corp. v. International Nickel Co., 262 F.2d 806, 807 (C.C.P.A.1959).

■■ This principle is qualified by the well established rule that a mark which is essentially descriptive in its primary meaning may acquire a secondary and legally protectible meaning if evidence is presented that in the applicable channel of commerce it has enjoyed substantially exclusive and continuous use. 15 U.S.C. § 1052(f); *Bada Company*, 426 F.2d at 11 and cases cited; Jean Patou, Inc. v. Jacqueline Cochran, Inc., 201 F.Supp. 861, 864 (S.D.N.Y.1962). However, defendant's usage of the term "condition" has not been of that degree of exclusiveness and continuity to merit the protective monopoly provided under the Act for sole exploitation of that term in describing its product.[13]

Further guidance is found in Application of Deister Concentrator Company, 289 F.2d 496 (C.C.P.A.1961) where, in resolving a related issue, the Court set forth certain deceptively obvious "tru-

---

acteristics of individual competing products. This is not considered to be the purpose of the Trademark Act of 1946. *La Maur, Inc.*, at first blush, would appear to be a contradiction of this conclusion, but upon examination it seems to be an exceptional case. There the Court, noting a "superabundance of evidence," upheld the statutory monopolization of the term "STYLE," which, arguably, is essentially descriptive of the process by which hair is arranged and prepared. The Court feels that that term never became an indispensable term prior to or concurrent with the period of appropriation, in contrast with the history of the term "condition." In *La Maur, Inc.*, "style" was initially appropriated in 1945, was first used (almost totally exclusively) for a particular hair spray in 1950, and was subsequently adopted with reference to a complete family of related cosmetic products ranging from five different wave sets to a nail polish remover, a creme rinse, and other cosmetic lotions and shampoos. The term

literally became equated with the producer, and not a particular good, as La Maur dominated that term's usage for nearly a quarter of a century. This Court is simply not convinced that after only seven years of nonexclusive use, notwithstanding media outlays and sales successes, the defendant has been able to equate in the public eye the term "condition" with its particular product to the exclusion of other competitors utilizing that term. The proposition that large expenditures of money for advertising creates a foundation for legal rights within the Act is not persuasive in light of other relevant factors. Carter-Wallace, Inc. v. Procter & Gamble Company, 434 F.2d 794. 800 (9th Cir., 1970); Smith v. Chanel, Inc., 402 F.2d 562, 568 (9th Cir., 1968); Roselux Chemical Co. v. Parsons Ammonia Company, 299 F.2d 855, 862–863 (C.C.P.A., 1962); and Wembley, Inc. v. Diplomat Tie Company, 216 F.Supp. 565, 580–581 (D.Md., 1963).

13. *See* note 12, and discussion, *supra.*

isms" which have reoccurred in trademark law.

(1) Trademarks enable one to determine the existence of common source; but not everything that enables one to determine source is a trademark.

(2) A trademark distinguishes one man's goods from the goods of others; but not everything that enables goods to be so distinguished will be protected as a trademark.

(3) Some trademarks are words or configurations which are protected because they have acquired a "secondary meaning"; but not every word or configuration that has a de facto "secondary meaning" is protected as a trademark . . . 289 F.2d at 502.

That decision also referred to the "Shredded Wheat" case, Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938) which contained language of some relevance to this case.

"Where an article may be manufactured by all, a particular manufacturer can no more assert exclusive rights in a form in which the public has become accustomed to see the article and which, in the minds of the public, is primarily associated with the article rather than a particular producer, *than it can in the case of a name with similar connections in the public mind* . . ." Application of Deister Concentrator Company, 289 F.2d at 503–504. (Emphasis added.)

As the public had associated the mark "SHREDDED WHEAT" with the particular "form" of the product in the breakfast cereal trade so this Court finds that the defendant has not been able to displace a similar association in the public's mind of the term "condition" with the "name" of the process by which the hair of adult females is enhanced in structure and appearance. The thrust of this particular rationale expressed in *Kellogg Co.* seems to be not that a single merchant with sufficient means and determination could never establish in the public mind the equation

of such a term with its source, but that "there is an overriding public policy of preventing their monopolization, of preserving the public right to copy." Application of Deister Concentrator, 289 F.2d at 504.

"The extent to which the owner of . . . a mark is given exclusive rights in it is determined by a tension between the desire to secure to producers the benefits of their labors by preventing consumer deception as to the source of goods, and *the desire to keep free the means of expression necessary for effective competition.* The public interest in preventing consumer deception or injury has rarely been thought of as the primary rationale behind trade-mark protection; . . ." [Trade-marks and Unfair Competition," 68 Harv.L.Rev. 814, 816.] Application of Deister Concentrator Company, 289 F.2d at 504. (Emphasis added.)

This premise of moderating the appropriation of essentially descriptive terms in order to preserve competitive relationships within a particular trade was recognized in Application of Helena Rubinstein, Inc., 410 F.2d 438 (C.C.P.A.1969).

"Whether appellant's goods are pasteurized as evidence shows, or simply could be pasteurized, or would normally be expected by the average purchaser to be pasteurized because so designated in the marks sought to be registered, the appellant cannot legally appropriate this common descriptive term for its own use . . . to the exclusion of all others who may desire to pasteurize the face creams they sell . . ." 410 F.2d at 441–442.

In that case, the court upheld the examiner's refusal to register the mark, "PASTEURIZED," noting that instead of being primarily indicative of the source of the goods it essentially was descriptive. 410 F.2d at 441. As "PASTEURIZED" essentially described the industrial process by which that particular facial cream was enhanced in its lu-

bricant properties so does "CONDI-TION" essentially describe the cosmetic process by which that particular hair conditioner enhances the structure and appearance of hair. Neither mark owner can justifiably thereby appropriate such a term to its own exclusive use thus depriving the trade of a descriptive term intimately related to the ultimate uses to which the respective products are applied.

■ Accordingly, this Court concludes that the term "condition" is so intimately associated with the functioning and process of application of the various competing products in the hair cosmetic trade that sanctioning its exclusive appropriation by one competitor would be to deprive others of an essential tool in competition on the market. The potential for substantially lessening competition as a result of an unsupportable statutory monopoly of that particular term in this industry seems particularly acute.[14] The use of the term "condition" by the defendant, notwithstanding its substantial investment in promoting its mark and the resultant commercial success, does not negate its impact in the trade as essentially a descriptive term pertaining to the function and purpose of the family of goods to which it belongs.[15] The public retains the right to employ this term in this trade because the alternative would substantially cripple competition with defendant's product, the identifying mark of which is for all practical purposes synonymous with a cosmetic process in which most adult females invest substantial sums of money each year.

■■ Assuming, arguendo, that defendant enjoyed exclusive use of the term "condition," this Court is not convinced that likelihood of confusion exists with respect to plaintiff's mark. Each trademark case must be assessed upon its own peculiar mix of facts and circumstances. L. J. Mueller Furnace Co. v. United Conditioning Corp., 222 F.2d 755, 757 (C.C.P.A.1955). Absence of evidence of specific instances of confusion of goods may, in certain circumstances, be influential in finding no likelihood of confusion. Paul Sachs Originals Co. v. Sachs, 325 F.2d 212, 216 (9th Cir., 1963); Best & Co. v. Miller, 167 F.2d 374, 377 (2nd Cir., 1948). Numerous factors are to be considered in determining the issue of likelihood of confusion, in addition to "substantial expenditures for advertising and promotion" and "resultant large sales." See 168 U.S. P.Q. at 190.[16] Such factors may include visual, verbal and intellective similarity; the class of goods in question; the marketing channels; the intent of defendant; evidence of actual confusion; and the strength or weakness of the marks in question. Carter-Wallace, Inc., 434 F.2d at 800 and cases cited. See Paul Sachs, 325 F.2d at 214; Sleeper Lounge Company v. Bell Manufacturing Co., 253 F.2d 720, 722–723 (9th Cir., 1958).

■ In assessing the likelihood of confusion, the surrounding extrinsic circumstances must be weighed and considered, including not only the general appearance of the marks, but their effect upon the participants in the competing market, the nature of the promotion campaign, and the intent of the competitors. Miles Laboratories, Inc. v. Frolich, 195 F.Supp. 256, 260–264 (S.D. Calif., 1961); aff'd per curiam 296 F. 2d 740. In resolving the question of similarity between trademarks, the marks are not to be dissected into units

14. Where a participant in a market chooses an inherently weak mark, he will not enjoy the breadth of protection afforded the owners of stronger marks. In such an instance his competitors may more closely approximate his mark without violating his rights than would be the case with a stronger mark. Fleetwood Company v. Hazel Bishop, Inc., 352 F. 841,

844 (7th Cir., 1965); Sure-Fit Products Co. v. Saltzson Drapery Co., 254 F.2d 158, 160 (C.C.P.A., 1958).

15. Fleetwood Company v. Mende, 298 F. 2d 797, 799 (C.C.P.A., 1962).

16. See note 12, and discussion, supra.

but to be considered as a whole. Apollo Shirt Co. v. Enro Shirt Co., 165 F.2d 469, 471 (C.C.P.A., 1948). It has also been held that trademarks will not ordinarily be found to provoke likelihood of confusion simply on the basis of a single term within the marks that is similar and of a descriptive nature. Alumatone Corporation v. Vita-Var Corporation, 183 F.2d 612, 615 (C.C.P.A., 1950).

In this case, "condition" is a term common to both marks, and, as a highly descriptive term relating to the functions and purposes for which such products are intended, is commonly utilized within the trade, if not as part of other marks, then as part of general descriptive usage supporting such marks. The addition of the word combination "CURL &" to the essentially descriptive term "condition" in plaintiff's mark is found to create a sufficiently distinctive dissimilarity with defendant's mark, "CONDITION," to preclude any likelihood of confusion on the part of professional beauty salon operators as the class of consumers to which the two products are commonly directed. Los Angeles Soap Company v. Lester Laboratories, 264 F.2d 909, 911 (C.C.P.A., 1959); Lauritzen & Company v. Borden Company, 239 F.2d 405, 407 (C.C.P.A., 1956); Everlasting Valve Co. v. Schiller, 21 F.2d 641, 643 (E.D.Pa., 1927); Ex Parte Butler's Inc., 114 U.S. P.Q. 468; Cf. Fleischmann Distilling Corp. v. Maier Brewing Company, 314 F.2d 149, 161 (9th Cir., 1963).

With respect to the commercial apprehension of the marks, the extrinsic circumstance that the plaintiff's advertising and distributing efforts are limited, in all practical effect, to the professionals of this trade is a critical factor. While similarity in sound and appearance may have a more fundamental and far-reaching impact when products are widely advertised over radio and television, or when they are openly displayed

for sale on retail shelves, where one is *selectively distributed to a discerning consumer with some expertise in the trade* the likelihood of confusion is substantially reduced. Thus, the professional beautician, being classified as the user in common of these two products, is found not likely to be confused as to their source because of her professional ability to discriminate between them.[17]

The Court finding in favor of the plaintiff with respect to the first issue, and, arguendo, with respect to the second issue, the third remaining issue is rendered moot.

The above being the findings of fact and conclusions of law, this Court holds that plaintiff is entitled to its prayer for restoration of the trademark "CURL & CONDITION," Registration No. 858,-448, for its full use and enjoyment. Defendant's infringement counterclaim is dismissed. Each party shall bear its own costs as incurred.

Judgment shall be entered accordingly.

---

17. The argument that the marketing practices of the plaintiff may be changed at any time, thus including the ordinary home consumer within the class of potential purchasers, is not persuasive in light of the market practices dictated by the nature of the product being intended exclusively for application by a trained professional. Los Angeles Soap, 264 F.2d at 911.